**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Emily A. Horne (State Bar No. 347723)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: ltfisher@bursor.com
          ehorne@bursor.com

**BURSOR & FISHER, P.A.**
Max S. Roberts (*Pro Hac Vice*)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile:  (212) 989-9163
E-mail: mroberts@bursor.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAWN FREGOSA, individually and on behalf of all other persons similarly situated,<br><br>                    Plaintiff,<br><br>          v.<br><br>MASHABLE, INC.,<br><br>                    Defendant. | Case No. 3:25-cv-1094-CRB<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br>Hon. Charles R. Breyer |

## TABLE OF CONTENTS

**PAGE**

NATURE OF THE ACTION ................................................................................1

THE PARTIES ....................................................................................................2

JURISDICTION AND VENUE ..........................................................................2

FACTUAL ALLEGATIONS ..............................................................................3

I.      THE CALIFORNIA INVASION OF PRIVACY ACT .................................3

II.     DEFENDANT VIOLATES THE CALIFORNIA INVASION OF PRIVACY ACT...........4

     A.     The Mechanics And Privacy Implications Of IP Addresses .....................5

           1.     Differentiating Between A Public Versus Private IP Address .................6

           2.     The Privacy Implications Of Public IP Addresses .........................9

     B.     The Trackers Are "Pen Registers" .......................................11

           1.     The ADNXS Tracker And The Data Brokers Partners It Cookie Syncs With .................................................................12

                (i)     Tapad .............................................................18

                (ii)     PubMatic ...........................................................19

           2.     The PubMatic Tracker And The Data Broker Partners It Cookie Syncs With .................................................................21

                (i)     Tapad .............................................................23

                (ii)     OpenX ............................................................24

                (iii)     Epsilon ...........................................................26

            3.     The Bounce Exchange Tracker ................................28

III.    DEFENDANT'S CONDUCT CONSTITUTES AN INVASION OF PLAINTIFF'S AND CLASS MEMBERS' PRIVACY.....................................................31

     A.     Data Brokers And Real-Time Bidding: The Information Economy ...................32

           1.     Data Brokers ..............................................32

           2.     Real-Time Bidding .......................................36

            3.     Cookie Syncing .........................................40

     B.     Defendant Uses The ADNXS Tracker For Targeted Advertising And Data Monetization .....................................................44

C.    Defendant Uses The PubMatic Tracker For Targeted Advertising, Identity Resolution, And Data Monetization........................................................46

D.    Defendant Uses The Bounce Exchange Tracker For Targeted Advertising, Identity Resolution, And Data Monetization.......................................49

IV.    PLAINTIFF'S EXPERIENCE ........................................................................51

V.    DEFENDANT IS SUBJECT TO JURISDICTION IN CALIFORNIA ..............................52

A.    Defendant's Website Is Hosted In California, And Defendant Employs CDNs In California To Speed Up Delivery To California Users............................52

B.    Defendant Knowingly Installs The Trackers On Californians' Browsers, And Knowingly Profits From The Selling And Sharing Of Californians' Personal Information ...............................................56

CLASS ALLEGATIONS....................................................................................59

CAUSES OF ACTION........................................................................................61

PRAYER FOR RELIEF ......................................................................................64

JURY DEMAND................................................................................................64

Plaintiff Dawn Fregosa ("Plaintiff"), individually and on behalf of all others similarly situated, by and through her attorneys, makes the following allegations pursuant to the investigation of her counsel and based upon information and belief, except as to allegations specifically pertaining to herself and her counsel, which are based on personal knowledge.

## NATURE OF THE ACTION

1.      Defendant Mashable, Inc. ("Defendant" or "Mashable") owns and operates a website, https://mashable.com (the "Website"), which is a digital news and entertainment offering with focus areas such as tech, science, social media, and shopping.

2.      When users visit the Website, Defendant causes three Trackers—the ADNXS Tracker, Wunderkind Tracker, and PubMatic Tracker (collectively, the "Trackers")—to be installed on Website visitors' internet browsers.  The Trackers are operated by separate and distinct third parties: Microsoft, Wunderkind, and PubMatic (the "Third Parties").  Through their respective Trackers, each of the Third Parties collect Website users' internet protocol ("IP") addresses and other device identifier information such as device type, browser type, and unique and persistent identifiers (the "Device Metadata").  Defendant then uses the data collected by the Trackers, and in conjunction with the Third Parties operating them, for targeted marketing and advertising that enable Defendant to monetize its Website.  That is, Defendant and the Third Parties benefit from the Third Parties' unconsented-to collection of Plaintiff's and Class Members' personal information.

3.      Because the Trackers capture Website visitors' "routing, addressing, or signaling information," the Trackers constitute a "pen register" under Section 638.50(b) of the California Invasion of Privacy Act ("CIPA").

4.      By installing and using the Trackers without Plaintiff's prior consent and without a court order, Defendant violated CIPA § 638.51(a).

5.      The allegations here are made more invasive by the entities operating the Trackers and collecting Plaintiff's and Class Members' IP Addresses and Device Metadata.  PubMatic and Wunderkind are data brokers—and Microsoft combines the information it collects about Website users with those of other brokers—that add the IP addresses and Device Metadata of Website users

to comprehensive user profiles and use that information to track Plaintiff and Class Members across the Internet.  Those data profiles are then provided to advertisers for more targeted and tailored advertising based on a broad universe of information.  The Third Parties also facilitate that targeted advertising by using IP addresses and Device Metadata to sell Defendant's user inventory to advertisers and allow advertisers to target specific users or groups of users with specific advertisements based on that information, including Website users' location.  All of this enriches Defendant, who is able to monetize its Website as the beneficiary of that advertising revenue.  Indeed, Defendant increases the value of its user base to prospective advertisers by allowing PubMatic, Wunderkind, and other data brokers to connect IP addresses and Device Metadata to broader profiles of other personal information.

6.      Plaintiff brings this action to prevent Defendant from further violating the privacy rights of California residents, and to recover statutory damages for Defendant's violation of CIPA § 638.51.

**THE PARTIES**

7.      Plaintiff Fregosa resides in San Leandro, California and has an intent to remain there, and is therefore a citizen of California.  Plaintiff Fregosa was in California when she visited the Website.

8.      Defendant Mashable, Inc. is a Delaware corporation with its principal place of business in New York, New York.

**JURISDICTION AND VENUE**

9.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(a) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00 exclusive of interest and costs, there are over 100 members of the putative class, and at least one class member is a citizen of a different state than Defendant.

10.      This Court has jurisdiction over Defendant for the reasons set forth below.  *See* Factual Allegations § V, *infra*.

11.     Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial portion of the events giving rise to this action occurred in this District.

## FACTUAL ALLEGATIONS

### I.     THE CALIFORNIA INVASION OF PRIVACY ACT

12.     The California Legislature enacted CIPA to protect certain privacy rights of California citizens.  The California Legislature expressly recognized that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society."  Cal. Penal Code § 630.

13.     As relevant here, CIPA § 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

14.     A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication."  Cal. Penal Code § 638.50(b).

15.     A "trap and trace device" is a "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication."  Cal. Penal Code § 638.50(b).

16.     In plain English, a "pen register" is a "device or process" that records *outgoing* information, while a "trap and trace device" is a "device or process" that records *incoming* information.

17.     Historically, law enforcement used "pen registers" to record the numbers of outgoing calls from a particular telephone line, while law enforcement used "trap and trace devices" to record the numbers of incoming calls to that particular telephone line.  As technology has advanced, however, courts have expanded the application of these surveillance devices to the Internet.

18.     For example, if a user sends an email, a "pen register" might record the email address it was sent from because this is the user's *outgoing* information.  On the other hand, if that same user receives an email, a "trap and trace device" might record the email address it was sent from because this is *incoming* information that is being sent to that same user.

19.     Although CIPA was enacted before the dawn of the Internet, "the California Supreme Court regularly reads statutes to apply to new technologies where such a reading would not conflict with the statutory scheme." *In re Google Inc.* 2013 WL 5423918, at *21 (N.D. Cal. Sep. 26, 2013); *see also, e.g.*, *Shah v. Fandom, Inc*, 754 F. Supp. 3d 924, 930 (N.D. Cal. 2024) (finding trackers similar to those at issue here were "pen registers" and noting "California courts do not read California statutes as limiting themselves to the traditional technologies or models in place at the time the statutes were enacted"); *Mirmalek v. Los Angeles Times Communications LLC*, 2024 WL 5102709, at *3-4 (N.D. Cal. Dec. 12, 2024) (same); *Moody v. C2 Educ. Sys. Inc.* 742F. Supp. 3d 1072, 1076 (C.D. Cal. 2024) ("Plaintiff's allegations that the TikTok Software is embedded in the Website and collects information from visitors plausibly fall within the scope of §§ 638.50 and 638.51."); *Greenley v. Kochava, Inc*, 684 F. Supp. 3d 1024, 1050 (S.D. Cal. 2023) (referencing CIPA's "expansive language" when finding software was a "pen register"); *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, [CIPA] Section 631(a) applies to Internet communications.").

20.     This accords with the fact that, "when faced with two possible interpretations of CIPA, the California Supreme Court has construed CIPA in accordance with the interpretation that provides the greatest privacy protection."  *Matera v. Google Inc.*, 2016 WL 8200619, at *19 (N.D. Cal. Aug. 12, 2016).

21.     Individuals may bring an action against the violator of any provision of CIPA—including CIPA § 638.51—for $5,000 per violation.  Cal. Penal Code § 637.2(a)(1).

## II.     DEFENDANT VIOLATES THE CALIFORNIA INVASION OF PRIVACY ACT

22.     To make Defendant's Website load on a user's internet browser, the browser sends an "HTTP request" or "GET" request to Defendant's server where the relevant Website data is stored.

In response to the request, Defendant's server sends an "HTTP response" back to the browser with a set of instructions. A general diagram of this process is pictured at Figure 1, which explains how Defendant's Website transmits instructions back to users' browsers in response to HTTP requests.

**Figure 1:**



23.    The server's instructions include how to properly display the Website—*e.g.*, what images to load, what text should appear, or what music should play.

24.    In addition, the server's instructions cause the Trackers to be installed on a user's browser. The Trackers then cause the browser to send identifying information—including the user's IP address and Device Metadata—to Microsoft, Wunderkind, and PubMatic. These Third Parties, through their Trackers, also set a cookie on Website users' browsers, which sends a unique identifier to these Third Parties that allows them to track users on the Website over multiple visits and across the Internet.

25.    Plaintiff and Class Members did not provide their prior consent to Defendant to install the Trackers on their browsers or use the Trackers. Nor did Defendant obtain a court order before installing or using the Trackers.

A.    **The Mechanics And Privacy Implications Of IP Addresses**

26.    An IP address is a unique identifier for a device, which is expressed as four sets of numbers separated by periods (*e.g.*, 192.168.123.132). The traditional format of IP addresses is called IPv4, and it has a finite amount of combinations and thus is limited to approximately 4.3 billion addresses. Because this proved to be insufficient as the Internet grew, IPv6 was introduced.

IPv6 offers a vastly larger address space with 340 undecillion possible addresses.   While IPv6 adoption has been increasing, many networks still rely on IPv4.[1]

27.    Much like a telephone number, an IP address guides or routes an intentional communication signal (*i.e.*, a data packet) from one device to another.  An IP address is essential for identifying a device on the internet or within a local network, facilitating smooth communication between devices.

   *1.    Differentiating Between A Public Versus Private IP Address*

28.    A public IP address is accessible from anywhere on the internet; it is assigned by an Internet Service Provider ("ISP") and it is unique globally.  Public IP addresses are required for devices that need direct internet access.

29.    While public IP addresses are unique, they are not necessarily "public" in the sense that they are freely accessible.  If an individual is not actively sending data packets out, the public IP address remains private and is not broadcast to the wider internet.

30.    Public IP addresses can be used to determine the approximate physical location of a device.  For example, services like iplocation.io, use databases that map IP addresses to geographic areas—often providing information about the country, city, approximate latitude and longitude coordinates, or even the internet service provider associated with the public IP.  This geolocation capability is leveraged by online advertising and user identification services.

31.    A private IP address is used within an internal network and is not routable on the public internet.  The Internet Assigned Numbers Authority ("IANA") reserves specific ranges of numbers to be exclusively used for private IP addresses (*e.g.*, 172.16.0.0 through 172.31.255.255). Thus, private IP addresses can be used repeatedly across different networks because they are isolated from the global internet.  For example, a home network in New York and an office network in Tokyo can both use the same private IP address (*e.g.*, 192.168.1.1) for their routers without conflict.

---

[1]    *See*, *e.g.*, *What is the Internet Protocol*, CLOUDFLARE, https://www.cloudflare.com/learning/network-layer/internet-protocol/; Stefano Gridelli, *What is an RFC1918 Address?*, NETBEEZ (Jan. 22, 2020), https://netbeez.net/blog/rfc1918/.

32.    The distinction between a public and private IP address is fundamental to the architecture of modern networks.  Public IP addresses facilitate global communication, while private IP addresses conserve the finite amount of combinations to make an IP address through local network communication.   And crucially, a private IP address does not divulge a user's geolocation, whereas a public IP address does and is thus extensively used in advertising.

33.    An analogy is useful.  A public IP address is like the number for a landline telephone for a household.  A private IP address is like each handset that is connected to that landline number (*e.g.*, "Handset #1," "Handset #2").  Alot can be gleaned from knowing the phone number who is making the call, while knowing Handset #1 versus Handset #2 is making a call provides additional information.

34.    The same is true of IP addresses.  The public IP address divulges the approximate location of the user that is connecting to the Internet and the router directing those communications (presumably the user's house or workplace), and it is the means through which the user actually communicates with the website and the Internet at large.  The private IP address then distinguishes between the devices accessing the same public IP address.[2]

**Figure 2:**



*Each device on a network has a private IP address, and the router has a public IP address to communicate with the rest of the internet.*

---

[2] While the Trackers do not collect private IP addresses, as discussed below, the Trackers also collect Device Metadata, which distinguishes between devices accessing the same public IP address.  So, by installing the Trackers on Website users' browsers, Defendant allows third parties to collect information that is analogous to a telephone number (the public IP address) and the specific handset that is making the call (the Device Metadata).

35.    Thus, the differences between public and private IP addresses are as follows:[3]

**Figure 3:**

| Category | Private IP address | Public IP address |
|---|---|---|
| Scope | The private IP address only has a local scope in your own network. | The public IP address's scope is global. |
| Communication | It is used so devices within a network can communicate with each other. | It allows access to the internet and is used for communication outside of your own network. |
| Uniqueness | It's an address from a smaller range that's used by other devices in other local networks. | It's a unique address that's not used by other devices on the internet. |
| Provider | The router assigns a private IP address to a specific device on the local network. | The internet service provider assigns the public IP address. |
| Range | Private IP address ranges: 10.0.0.0 – 10.255.255.255, 172.16.0.0 – 172.31.255.255, 192.168.0.0 – 192.168.255.255 | Any IP address that isn't within a private IP address range. |

36.    A public IP address is therefore "routing, addressing, or signaling information."

37.    A public IP address is "addressing" information because it determines the general geographic coordinates of the user who is accessing a website.

38.    A public IP address is "routing" or "signaling" information because it is sending or directing the user's communication from the router in their home or work to the website they are communicating with, and ensuring that "emails, websites, streaming content, and other data reaches you correctly."[4]

---

[3] WHAT'S THE DIFFERENCE BETWEEN A PUBLIC AND PRIVATE IP ADDRESS?, AVIRA (Jan. 31, 2024), https://www.avira.com/en/blog/public-vs-private-ip-address.

[4] Anthony Freda, *Private IP vs Public IP: What's the Difference?*, AVG (June 4, 2021), https://www.avg.com/en/signal/public-vs-private-ip-address.

*2.    The Privacy Implications Of Public IP Addresses*

39.    Through a public IP address, a device's state, city, zip code, and approximate latitude and longitude can be determined.    Thus, knowing a user's public IP address—and therefore geographical location—"provide[s] a level of specificity previously unfound in marketing."[5]

40.    A public IP address allows advertisers to (i) "[t]arget [customers by] countries, cities, neighborhoods, and … postal code"[6] and (ii) "to target specific households, businesses[,] and even individuals with ads that are relevant to their interests."[7]    Indeed, "IP targeting is one of the most targeted marketing techniques [companies] can employ to spread the word about [a] product or service"[8] because "[c]ompanies can use an IP address … to personally identify individuals."[9]

41.    In fact, a public IP address is a common identifier used for "geomarketing," which is "the practice of using location data to identify and serve marketing messages to a highly-targeted audience.    Essentially, geomarketing allows [websites] to better serve [their] audience by giving [them] an inside look into where they are, where they have been, and what kinds of products or services will appeal to their needs."[10]    For example, for a job fair in specific city, companies can send advertisements to only those in the general location of the upcoming event.[11]

42.    "IP targeting is a highly effective digital advertising technique that allows you to deliver ads to specific physical addresses based on their internet protocol (IP) address. IP targeting technology works by matching physical addresses to IP addresses, allowing advertisers to serve ads

---

[5] *IP Targeting: Understanding This Essential Marketing Tool*, ACCUDATA (Nov. 20, 2023), https://www.accudata.com/blog/ip-targeting/.

[6] *Location-Based Targeting That Puts You in Control*, CHOOZLE, https://choozle.com/geotargeting-strategies/.

[7] Herbert Williams, *The Benefits of IP Address Targeting for Local Businesses*, LINKEDIN (Nov. 29, 2023), https://tinyurl.com/c2ne77ua.

[8] *IP Targeting: Understanding This Essential Marketing Tool*, ACCUDATA (Nov. 20, 2023), https://www.accudata.com/blog/ip-targeting/.

[9] Trey Titone, *The Future Of IP Address As An Advertising Identifier*, AD TECH EXPLAINED (May 16, 2022), https://adtechexplained.com/the-future-of-ip-address-as-an-advertising-identifier/.

[10] *See, e.g.*, *The Essential Guide to Geomarketing: Strategies, Tips & More*, DEEP SYNC (Nov. 20, 2023), https://deepsync.com/geomarketing/.

[11] *See, e.g.*, *Personalize Your Website And Digital Marketing Using IP Address*, GEOFLI, https://geofli.com/blog/how-to-use-ip-address-data-to-personalize-your-website-and-digital-marketing-campaigns.

to specific households or businesses based on their location."[12]

43.     "IP targeting capabilities are highly precise, with an accuracy rate of over 95%. This means that advertisers can deliver highly targeted ads to specific households or businesses, rather than relying on more general demographics or behavioral data."[13]

44.     In addition to "reach[ing] their target audience with greater precision," businesses are incentivized to use a customer's public IP address because it "can be more cost-effective than other forms of advertising."[14]   "By targeting specific households or businesses, businesses can avoid wasting money on ads that are unlikely to be seen by their target audience."[15]

45.     In addition, "IP address targeting can help businesses to improve their overall marketing strategy."[16]   "By analyzing data on which households or businesses are responding to their ads, businesses can refine their targeting strategy and improve their overall marketing efforts."[17]

46.     The collection of IP addresses here is particularly invasive here given that both Wunderkind and PubMatic are data brokers.  As a report from NATO found:

> [a] data broker may receive information about a[] [website] user, including his … IP address.  The user then opens the [website] while his phone is connected to his home Wi-Fi network.  When this happens, the data broker can use the IP address of the home network to identify the user's home, and append this to the unique profile it is compiling about the user.  If the user has a computer connected to the same network, this computer will have the same IP address. The data broker can then use the IP address to connect the computer to the same user, and identify that user when their IP address makes requests on other publisher pages within their ad network.  Now the data broker knows that the same individual is using both the phone and the computer, which allows it to track behaviour across devices and target the user and their devices with ads on different

---

[12] *IP Targeting*, SAVANT DSP, https://www.savantdsp.com/ip-targeting?gad_source=1&gclid=Cj0KCQjw1Yy5BhD-ARIsAI0RbXZJKJSqMI6p1xAxyqai1WhAiXRJTbX8qYhNuEvIfSCJ4jfOV5-5maUaAgtNEALw_wcB.

[13] *Id.*

[14] Herbert Williams, *The Benefits of IP Address Targeting for Local Business*es, LINKEDIN (Nov. 29, 2023),  https://www.linkedin.com/pulse/benefits-ip-address-targeting-local-businesses-herbert-williams-z7bhf.

[15] *Id.*

[16] *Id.*

[17] *Id.*

networks.[18]

47.     In other words, not only does the collection of IP addresses by the Third Parties cause harm in and of itself, data brokers like Wunderkind and Pubmatic can use IP addresses to identify users, append the IP address to a unique profile containing even more information about the user, specifically attaches IP addresses to comprehensive user profiles, and tracki Plaintiff and Class Members across the Internet using their IP addresses and compiling vast reams of other personal information in the process.

48.     For these reasons, under Europe's General Data Protection Regulation, IP addresses are considered "personal data, as they can potentially be used to identify an individual."[19]

**B.     The Trackers Are "Pen Registers"**

49.     When companies build their websites, they install or integrate various third-party scripts into the code of the website in order to collect data from users or perform other functions.[20]

50.     Often times, third-party scripts are installed on websites "for advertising purposes."[21]

51.     Further, "[i]f the same third-party tracker is present on many sites, it can build a more complete profile of the user over time."[22]

52.     Defendant has long incorporated the Trackers' code into the code of its Website, including when Plaintiff and Class Members visited the Website.  Thus, when Plaintiff visited the Website, the Website caused the Trackers to be installed on Plaintiff's and other users' browsers.

53.     As described below, when a user visits the Website, the Website's code—as programmed by Defendant—installs the Trackers onto the user's browser.  This allows the Third

---

[18] HENRIK TWETMAN & GUNDARS BERGMANIS-KORATS, NATO STRATEGIC COMMUNICATIONS CENTRE OF EXCELLENCE, DATA BROKERS AND SECURITY at 11 (2020), https://stratcomcoe.org/cuploads/pfiles/data_brokers_and_security_20-01-2020.pdf.

[19] IS AN IP ADDRESS PERSONAL DATA?, CONVESIO, https://convesio.com/knowledgebase/article/is-an-ip-address-personal-data/; *see also* WHAT IS PERSONAL DATA?, EUROPEAN COMMISSION, https://commission.europa.eu/law/law-topic/data-protection/reform/what-personal-data_en

[20] *See Third-party Tracking*, PIWIK, https://piwik.pro/glossary/third-party-tracking/ ("Third-party tracking refers to the practice by which a tracker, other than the website directly visited by the user, traces or assists in tracking the user's visit to the site. Third-party trackers are snippets of code that are present on multiple websites. They collect and send information about a user's browsing history to other companies…").

[21] *Id.*

[22] *Id.*

Parties—through their respective Trackers—to collect Plaintiff's and Class Members' IP addresses and Device Metadata, and pervasively track them across the Internet.

54.     The Trackers also causes additional data points to be sent from Plaintiff's and Class Members' browser to the Third Parties, which are meant to uniquely identify users across sessions and devices.  In addition to the public IP address, key elements include the user-agent string (browser, operating system, and device type) and device capabilities such as supported image formats and compression methods.  Persistent identifiers like the PUID, GUID, UID, PSVID, and User-Agent ensure users can be tracked even after clearing standard session data like cookies.  Advanced methods like fingerprinting and server-side matching remain unaffected by cookie deletion.  Combined, these elements form a detailed, unique fingerprint that allows for cross-site tracking and behavioral profiling.

55.     Defendant and the Third Parties then use the public IP addresses, Device Metadata, and other information of Website visitors that are collected and set by the Trackers, including those of Plaintiff and Class Members, to deanonymize Plaintiff and Class Members, serve hyper-targeted advertisements, and unjustly enrich themselves through this improperly collected information.

56.     At no time prior to the installation and use of the Trackers on Plaintiff's and Class Members's browsers, or prior to the use of the Trackers, did Defendant procure Plaintiff's and Class Members's consent for such conduct.  Nor did Defendant obtain a court order to install or use the Trackers.

      *1.    The ADNXS Tracker And The Data Brokers Partners It*
                     *Cookie Syncs With*

57.     Microsoft is a technology company with software-as-a-service products, such as Microsoft Advertising.  Microsoft owns and operates the ADNXS Tracker, which it provides to website owners like Defendant for a fee.

58.     According to Microsoft, "[w]ith an integrated platform advantage and a focus on data-driven performance, [Microsoft] enables you to engage audiences on all screens and drive business results."[23]

59.     As described in more detail below, Microsoft is a "demand side platform" that facilities the selling of Defendant's Website users to interested advertisers, who will bid to show those users advertisements targeted to their identity and location.  This process enables Defendant to monetize its Website.  To achieve this, Microsoft uses its Tracker to receive, store, and analyze information collected from website visitors, such as visitors of Defendant's Website.

60.     The first time a user visits Defendant's Website, the user's browser sends an HTTP request to Defendant's server, and Defendant's server sends an HTTP response with directions to install the ADNXS Tracker on the user's browser.  The ADNXS Tracker, in turn, instructs the user's browser to send Microsoft the user's IP address and Device Metadata—which Microsoft records—as the below screenshot of traffic from Plaintiff's browser indicates (relevant portions highlighted in red boxes).[24]

//

//

//

//

//

//

//

//

//

//

---

[23] *Microsoft Invest*, MICROSOFT ADVERTISING, https://about.ads.microsoft.com/en/solutions/technology/microsoft-invest-dsp#accordion-b751e6297a-item-73282c0a03.

[24] All but the first two digits of Plaintiff's IP address have been redacted throughout this Complaint to protect her privacy.

**Figure 4:**



61.     Moreover, Microsoft stores a cookie (the unique identifier, "UUID2" in Figure 4 above) with the user's IP address and Device Metadata in the user's browser cache. The UUID2 "[r]egisters a unique ID that identifies a returning user's device" that "is used for targeted ads."[25]

62.     When the user subsequently visits Defendant's Website, the ADNXS Tracker locates the cookie identifier stored on the user's browser. If the cookie is stored on the browser, the ADNXS Tracker causes the browser to send the UUID2 along with the user's IP address and Device Metadata to Microsoft.

63.     Using the UUID2, IP addresses, and Device Metadata, Microsoft can track and identify Website users across the Internet. A general diagram of this process is pictured as Figure 5, which explains how the Website causes the ADNXS Tracker to install a cookie on the user's browser and instructs the user's browser to send the user's IP address and Device Metadata along with the UUID2.

---

[25] TYSABRL, COOKIES, https://www.tysabri.com/en_us/cookies.html.

1

2

**Figure 5:**



3

4

5

6

7

8

9

10

64.    If the user clears his or her cookies, then the user wipes out the ADNXS Tracker from its cache.  Accordingly, the next time the user visits Defendant's Website the process begins over again: (i) Defendant's server installs the ADNXS Tracker on the user's browser, (ii) the ADNXS Tracker instructs the browser to send Microsoft the user's IP address and Device Metadata, (iii) the ADNXS Tracker stores a UUID2 value in the browser cache, and (iv) Microsoft will continue to receive the user's IP address, Device Metadata, and UUID2 on subsequent Website visits as part of the cookie transmission.

11

12

13

14

15

65.    In all cases, however, Microsoft receives a user's IP address, Device Metadata, uuid2 every time its Tracker is loaded by the Website.

16

66.    In addition to the UUID2, the ADNXS Tracker also sets at least three other cookies with their own unique identifiers on the user's browser, as the below screenshot of traffic from Plaintiff's browser indicates (relevant portions highlighted in red boxes):

17

18

19

20

//

21

//

22

//

23

//

24

//

25

//

26

//

27

//

28

**Figure 6:**



67.    The first cookie set by the ADNXS Tracker is the "XANDR_PANID," which "registers data on the visitor" and "is used to optimize advertisement relevance."[26]

68.    The second cookie set by the ADNXS Tracker is "receive-cookie-deprecation," which "[c]ollects information on user behaviour on multiple websites" that "is used in order to optimize the relevance of advertisement on the website."[27]  The "receive-cookie-deprecation" value here is "1," which corresponds to "on" or "true" in binary.[28]

69.    The third cookie set by the ADNXS Tracker is the "UIDS."  The "UIDS" value is encoded in Base64, which can be easily decoded on publicly available websites.[29]  Decoding the UIDS values above yields the other third parties that the ADNXS Tracker is syncing with—and who are syncing their own unique user IDs with the ADNXS Tracker—which are then permanently stored with the cookie on the users' browsers.  This allows Microsoft to identify the user based on other third-party identifiers—as well as for those third parties to associate the user in their own internal files—and this value is constantly updated as Microsoft syncs with further third parties.  For instance, the below screenshot shows the "UIDS" cookie includes identifiers for the registered data brokers

---

[26] TYSABRI, COOKIES, https://www.tysabri.com/en_us/cookies.html.

[27] *Id.*

[28] BINARY, TECHTARGET, https://www.techtarget.com/whatis/definition/binary.

[29] *See, e.g.*, https://www.base64decode.org/.

like Sovrn,[30] OpenX,[31] Outbrain.[32]  The ADNXS Tracker also syncs with TripleLift, which is an SSP (described below) that provides identity resolution services through its "TripleLift Audiences" feature[33]:

**Figure 7:**



70.    The ADNXS Tracker will also share the user's UUID2 value with other third parties on the Website.  The explicit purpose of this process—which is called "cookie syncing" and is alleged in more detail below—is to identify the user by matching that user with any profiles

---

[30] DATA BROKER REGISTRATION FOR SOVRN, INC., https://oag.ca.gov/data-broker/registration/187736.

[31] DATA BROKER REGISTRATION FOR OPENX TECHNOLOGIES, INC., https://oag.ca.gov/data-broker/registration/193614.

[32] DATA BROKER REGISTRATION FOR OUTBRAIN INC., https://oag.ca.gov/data-broker/registration/186707.

[33] PUBLISHERS, TRIPLELIFT, https://triplelift.com/publisher-solutions/.

Microsoft and/or these other third parties may have on the user, which are then provided by Microsoft for sale to advertisers.

**(i)**      <u>**Tapad**</u>

71.    For example, Microsoft syncs its UUID2 with the Tapad Pixel.  As the below screenshot from Plaintiff's browser indicates, the value of the "partner_device_id" parameter matches the value of the UUID2 parameter in Figure 4.   Indeed, the "partner_id" is even identified to be "APPNEXUS."  Tapad is also enhancing the information Microsoft knows about Plaintiff with information that Tapad knows about Plaintiff, something indicated by the path of the GET request, "idsync."  Finally, Tapad is installing its own cookies on Plaintiff's browser for further tracking, syncing, and de-anonymization.

**Figure 8:**



72.    Tapad is a registered data broker in California[34] and is owned by Experian,[35] another registered data broker.[36]  The purpose of the Tapad Pixel—which is owned and operated by these entities and used is in conjunction with Experian's services—is to perform identity resolution.  As Experian describes it:

> [i]dentity resolution matches fragmented identifiers to a single profile. This creates a unified, cross-channel view of a consumer that helps marketers understand a customer's demographics, lifestyle, interests, and where and how they engage with your brand.  Identity

---

[34]  Data Broker Registration for Tapad, Inc., https://oag.ca.gov/data-broker/registration/187511.

[35]  Allison Schiff, *Telenor Sells Tapad to Experian for $280 Million*, adexchanger (Nov. 19, 2020), https://www.adexchanger.com/privacy/telenor-sells-Tapad-to-experian-for-280-million/.

[36]  Data Broker Registration for Experian Information Solutions, Inc., https://oag.ca.gov/data-broker/registration/186691.

resolution improves campaign targeting and enables marketers to deliver personalized marketing messages.[37]

73.    Tapad identifies users by "crunching 150 billion data points—from cookies, cellphone IDs (which link individual phones to app downloads and Web browsing), Wi-Fi connections, website registrations, browsing history and other inputs."[38]    Tapad then aggregated these inputs into what it called a "Device Graph," which allows advertisers to connect individuals to all the devices those individuals use for the purpose of delivering targeted advertisements.[39]

74.    Tapad integrates with Experian's "offline consumer data set (purchase behaviors, interests, lifestyle info)."[40]    This includes "first-party data such as names, physical addresses, email addresses, mobile ad identifiers (MAIDs), IP addresses, and other information."[41]

### (ii)    PubMatic

75.    As another example, Microsoft syncs the UUID2 with PubMatic, another registered data broker in California.[42]    As pictured in the below screenshot from Plaintiff's browser on the Website, the value of the "KRTBCOOKIE_57" parameter matches the value of the UUID2 parameter in Figure 4 above.    This allows Microsoft to obtain whatever information PubMatic has on the user (and vice versa).    Indeed, PubMatic admits that the KRTBCOOKIEs are used "to correlate our user IDs with those of our partners (such as demand side platform clients or other advertising technology companies).    We pass the information stored by the partner in this cookie to the partner when it is considering whether to purchase advertisements.    This enables the partner to make better decisions about whether to display an advertisement to you."[43]    PubMatic also sets a KADUSERCOOKIE on the user's browser (which is likewise syncing with the ADNXS Tracker),

---

[37] https://www.experian.com/marketing/consumer-sync/identity-resolution.

[38] *Id*.

[39] https://techcrunch.com/2016/02/01/telenor-jumps-into-ad-tech-acquires-Tapad-for-360m/.

[40] *Id*.

[41] *Id.* (cleaned up).

[42] DATA BROKER REGISTRATION FOR PUBMATIC. INC., https://oag.ca.gov/data-broker/registration/186702.

[43] PLATFORM COOKIE & OTHER SIMILAR TECHNOLOGIES POLICY, PUBMATIC, https://pubmatic.com/legal/platform-cookie-policy/.

which is used to "uniquely identify each browser or device from which an individual user visits our partners' websites."[44]

**Figure 9:**



76.    PubMatic is another of the Third Parties, and so its features are described in more detail below.  But it is notable that, given PubMatic also syncs with various other data brokers (as described below), Microsoft would also learn what these other third party data brokers know about Website users when Microsoft syncs with PubMatic.

77.    This is a non-exhaustive list of the entities with whom Microsoft syncs its user cookies.  Suffice it to say, Microsoft is syncing its user cookies with numerous registered data brokers to collect as much information about a user as possible and de-anonymize the user, all of which is used for advertising purposes.

78.    The ADNXS Tracker is at least a "process" because it is "software that identifies consumers, gathers data, and correlates that data."  *Greenley*, 684 F. Supp. 3d at 1050.

79.    Further, the ADNXS Tracker is a "device" because "in order for software to work, it must be run on some kind of computing device."  *See*, *e.g.*, *James v. Walt Disney Co.*, 701 F. Supp. 3d 942, 952 (N.D. Cal. 2023).

80.    Because the ADNXS Tracker captures the outgoing information—the IP address, Device Metadata, and unique user IDs—from visitors to the Website, it is a "pen register" for the purposes of CIPA § 638.50(b).

---

[44] PLATFORM COOKIE & OTHER SIMILAR TECHNOLOGIES POLICY, https://pubmatic.com/legal/platform-cookie-policy/.

81.     The ADNXS Tracker is also a "pen register" because its "UUID2" is used to ascertain the identity of the user communicating with the Website and thus constitutes "addressing" information.

2.     *The PubMatic Tracker And The Data Broker Partners It Cookie Syncs With*

82.     PubMatic is a software-as-a-service company that develops the PubMatic Tracker, which it provides to website owners like Defendant for a fee.  PubMatic is a registered data broker in California.[45]

83.     According to PubMatic, it is "one of the world's leading scaled digital advertising platforms" and "offer[s] more transparent advertising solutions to publishers, media buyers and data owners, allowing [their clients] to harness the power and potential of the open internet to drive better business outcomes."[46]

84.     As described in more detail below, PubMatic is a "supply side platform" that enables companies like Defendant to sell their user inventory to advertisers, thereby earning revenue and monetizing data.  To achieve this, PubMatic uses its Tracker to receive, store, and analyze information collected from website visitors, such as visitors of Defendant's Website.

85.     Similar to the above, the first time a user visits Defendant's Websites, the user's browser sends an HTTP request to Defendant's server, and Defendant's server sends the HTTP response.  This response also includes directions to install the PubMatic Tracker on the user's browser.  The PubMatic Tracker, in turn, allows PubMatic to collect and record the user's IP address and Device Metadata, as the below screenshot from Plaintiff's browser on the Website indicates (relevant portions highlighted in red boxes):

//

//

//

---

[45] DATA BROKER REGISTRATION FOR PUBMATIC, INC., https://oag.ca.gov/data-broker/registration/186702.

[46] *The Supply Chain Of The Future. Delivered*, PUBMATIC, https://pubmatic.com/about-us (last visited Jan. 18, 2024).

**Figure 10:**



86.    Indeed, as PubMatic admits, its Tracker "automatically collects" "Browser and Device Information, such as the IP address you use to connect to an online service; device type and model; manufacturer; operating system type and version (e.g. iOS or Android); web browser type and version (e.g., Chrome or Safari); user-agent; carrier name; time zone; network connection type (e.g., Wi-Fi or cellular); and information about our Publisher's apps and versions currently active on a device."[47]

87.    Moreover, PubMatic stores a cookie with the user's IP address and Device Metadata in the user's browser cache (the unique identifier, "KADUSERCOOKIE" in the Figure 10).  When the user subsequently visits Defendant's Website, the PubMatic Tracker locates the cookie identifier stored on the user's browser.  If the cookie is stored on the browser, the PubMatic Tracker causes the browser to send the cookie along with the user's IP address and Device Metadata to PubMatic.

---

[47] Advertiser Platform Privacy Policy, https://pubmatic.com/legal/privacy-policy/#userinfowecollect

88.     Using the KADUSERCOOKIE, IP addresses, and Device Metadata, PubMatic can track and identify Website users across the Internet.  A general diagram of this process is pictured as Figure 5.

89.     If the user clears his or her cookies, then the user wipes out the PubMatic Tracker from its cache.  Accordingly, the next time the user visits Defendant's Website the process begins over again: (i) Defendant's server installs the PubMatic Tracker on the user's browser, (ii) the PubMatic Tracker instructs the browser to send PubMatic the user's IP address and Device Metadata, (iii) the PubMatic Tracker stores the KADUSERCOOKIE in the browser cache, and (iv) PubMatic will continue to receive the user's IP address and Device Metadata on subsequent Website visits with the cookie transmission.

90.     In all cases, however, PubMatic receives a user's IP address, Device Metadata, and unique KADUSERCOOKIE every time its Tracker is loaded by the Website, as the above screenshot of traffic from Plaintiff's browser indicates.

91.     The PubMatic Tracker will also share the user's KADUSERCOOKIE value with other third parties on the Website.  The explicit purpose of this process is to identify the user by matching that user with any profiles PubMatic and/or these other third parties may have on the user, which are then provided by PubMatic for sale to advertisers.

### (i)     Tapad

92.     For example, PubMatic syncs its KADUSERCOOKIE with the Tapad Pixel, whose functionalities are described above in conjunction with Microsoft's ADNXS Tracker.  As the below screenshot from Plaintiff's browser indicates, the value of the "partner_device_id" parameter matches the value of the KADUSERCOOKIE parameter in Figure 10.  Tapad is also enhancing the information PubMatic knows about Plaintiff with information that Tapad knows about Plaintiff, something indicated by the path of the GET request, "idsync."  Finally, Tapad is installing its own cookies on Plaintiff's browser for further tracking, syncing, and de-anonymization.

**Figure 11:**



```
:authority  pixel.tapad.com
   :method  GET
      :path  /idsync/ex/receive?partner_id=33718 partner_device_id=60B91819-BCBC-4919-B535-30C0374D6E78
   :scheme  https
     accept  image/avif,image/webp,image/apng,image/svg+xml,image/*,*/*;q=0.8
accept-encoding  gzip, deflate, br, zstd
accept-language  en-US,en;q=0.9
     cookie  TapAd_TS=1601577059640; TapAd_DID=40b51b81-0414-11eb-920f-eed7f968dd93; TapAd_3WAY_SYNCS=1!2395-2!1894-3!1860
     referer  https://ads.pubmatic.com/
sec-ch-ua-mobile  ?0
sec-ch-ua-platform  "macOS"
sec-fetch-dest  image
sec-fetch-mode  no-cors
sec-fetch-site  cross-site
  user-agent  Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/123.0.0.0 Safari/537.36
```

(ii)     **OpenX**

93.     As another example, PubMatic also syncs its KADUSERCOOKIE with the OpenX Tracker, which operated by OpenX, another registered data broker in California.[48]   As the below screenshot from Plaintiff's browser indicates, the value of the "val=" parameter matches the value of the KADUSERCOOKIE parameter in Figure 10.   OpenX is also enhancing the information PubMatic knows about Plaintiff with information that OpenX knows about Plaintiff.  Finally, OpenX is installing its own cookies on Plaintiff's browser for further tracking, syncing, and de-anonymization.

**Figure 12:**



```
:authority  us-u.openx.net
   :method  GET
      :path  /w/1.0/sd?id=540245193&val=60B91819-BCBC-4919-B535-30C0374D6E78&gdpr=0&gdpr_consent=
   :scheme  https
     accept  image/avif,image/webp,image/apng,image/svg+xml,image/*,*/*;q=0.8
accept-encoding  gzip, deflate, br, zstd
accept-language  en-US,en;q=0.9
     cookie  i=da88947b-e0e7-4d5c-88b2-929cda5b291a|1601577059
     referer  https://ads.pubmatic.com/
  sec-ch-ua  "Google Chrome";v="123", "Not:A-Brand";v="8", "Chromium";v="123"
sec-ch-ua-mobile  ?0
sec-ch-ua-platform  "macOS"
sec-fetch-dest  image
sec-fetch-mode  no-cors
sec-fetch-site  cross-site
  user-agent  Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/123.0.0.0 Safari/537.36
```

---

[48] *Data Broker Registration for OpenX Technologies, Inc.*, OFFICE OF THE ATTORNEY GENERAL, https://oag.ca.gov/data-broker/registration/193614 (last accessed Feb. 18, 2025).

94.     OpenX helps companies like Defendant "utilize their [first party] data, leverage [third party data], and package up audiences for marketers that will drive ad revenue."[49]  OpenX takes this data and uses it to "match [a company's] audience against [OpenX's] graph to put users in audience segments that [OpenX] mak[es] available to marketers."[50]

95.     OpenX can then use these individual profiles to provide marketers, such as Defendants, with curated packages that identify and target specific customers.[51]

96.     OpenX splits this up into two different types of packages.  The first are inventory packages that allows marketers to "[s]howcase [their] brand alongside brand-safe inventory across [OpenX's] network of trusted publishers, reaching consumers *wherever* and *whenever* they engage with their favorite content."[52]  The second are data driven packages that "[e]ngage customers with packages powered by data-driven curation, and drive performance on brand-safe inventory. [Allowing companies, like Defendants to e]ffortlessly choose from pre-built packages powered by audience, contextual, attention, or sustainability data and [OpenX's] proprietary identity graph."[53]

97.     This identity graph provides companies, like Defendants and the other Third Parties, access to 800 million hashed emails, 200 million hashed phone numbers, over 200 million U.S. users instrumented for data and identity, 48 million CTV users instrumented for data and identity, over 5,000 requests per user per month, and 3,000 data attributes available for targeting.[54]

---

[49] *OpenAudience*, OPENX, https://www.openx.com/why-openx/openaudience/ (last accessed Jan. 27, 2025).  First-party data is data that websites "collect directly from [their] customers," while third-party data is data that is "acquire[d] from a data aggregator" that does "not collect data directly but obtain[s] it from other companies and compile[s] it into a single dataset."  WHAT IS THE DIFFERENCE BETWEEN FIRST-PARTY, SECOND-PARTY AND THIRD-PARTY DATA?, CUSTOMER DATA PLATFORM RESOURCE, https://tinyurl.com/2htc6a8n.

[50] *Data Activation*, OPENX, https://www.openx.com/why-openx/openaudience/ (last accessed Feb. 3, 2025).

[51] *Curated Packages*, OPENX, https://www.openx.com/curated-packages/ (last accessed Feb. 4, 2025).

[52] *Id.* (emphasis added).

[53] *Id.*

[54] *OpenAudience*, OPENX, https://www.openx.com/why-openx/openaudience/.

98.    By way of example, OpenX sells a "Health Insurance Data Driven Package" that targets consumers who have viewed advertisements from health insurance advertisers.[55]  This helps companies target people who have indicated an interest in specific health insurance related content.

### (iii)    Epsilon

99.    As a final example, the PubMatic Tracker syncs its KADUSERCOOKIE with the Dotomi Pixel, which is operated by Epsilon, another registered data broker in California.[56]  As the below screenshot from Plaintiff's browser indicates, the value of the "nuid" parameter matches the value of the KADUSERCOOKIE parameter pictured in Figure 10 above.  Indeed, the "pubmatic-match.dotomi.com" value leaves little doubt that PubMatic is matching its cookies with the Dotomi Pixel to obtain any information Epsilon has about the user.  Finally, Epsilon is enhancing this user information by installing its own cookie on the user's browser.

**Figure 13:**



100.    Epsilon is a global advertising and marketing technology company and "is the only digital advertising services partner that connects every display, online video, connected TV and audio impression to a real person."[57]

---

[55] *Health Insurance Data Driven Package*, OPENX, https://www.openx.com/curated-packages/health-insurance/ (last accessed Feb. 04, 2025).

[56] DATA BROKER REGISTRATION FOR EPSILON DATA MANAGEMENT, LLC, https://oag.ca.gov/data-broker/registration/186453.

[57] *Epsilon Digital*, EPSILON, https://www.epsilon.com/us/products-and-services/epsilon-digital.

101.    Epsilon recognizes that its clients want "[t]o move potential customers from awareness to action" and thus "need to know who [the clients are] reaching."[58] Thus, with Epsilon's "CORE ID, the industry's only identity solution using all available online and offline identifiers, brands can reach the right person across their favorite content on any device."[59]

102.    Epsilon boasts that it has "[u]nrivaled accuracy at an individual level" because its technology requires a "complete name and address validated by transactions" to "ensure marketers reach the right person with maximum precision and efficiency."[60] "The CORE ID graph of 200M+ U.S. consumers is the only solution grounded in offline names and address. This allows us to enable omnichannel people-based activation, measurement and waste reduction."[61]

103.    Epsilon advertisers it procures consumers' identities from "public records (including voter registration files, phone books, deeds, and permits), surveys ('self-reported data from 20 million households'), partners (data from corporate sources), and 'multi-sourced' information, which it describes as 'real transactional data' on categories of purchases."[62] Thus, Epsilon provides all of this information to PubMatic when PubMatic syncs its KADUSERCOOKIE with the Dotomi Pixel.

104.    This is a non-exhaustive list of the entities with whom PubMatic syncs its user cookies. Suffice it to say, PubMatic is syncing its user cookie with numerous registered data brokers to collect as much information about a user as possible and de-anonymize the user, all of which is used for advertising purposes.

105.    The PubMatic Tracker is at least a "process" because it is "software that identifies consumers, gathers data, and correlates that data." *Greenley*, 684 F. Supp. 3d at 1050.

---

[58] *Epsilon Digital | Online Video*, Epsilon, https://www.epsilon.com/us/products-and-services/epsilon-digital/online-video.

[59] *Id.*

[60] *Identity: CODE ID*, Epsilon, https://www.epsilon.com/us/products-and-services/identity-core-id.

[61] *Id.*

[62] Justin Sherman, Duke Sanford Cyber Policy Program, Data Brokers and Sensitive Data on U.S. Individuals: Threats to American Civil Rights, National Security, and Democracy, at 7 (Duke Sanford Cyber Policy Program, 2021), https://tinyurl.com/hy9fewhs.

106.     Further, the PubMatic Tracker is a "device" because "in order for software to work, it must be run on some kind of computing device."  *See, e.g.*, *James*, 701 F. Supp. 3d at 952.

107.     Because the PubMatic Tracker captures the outgoing information—the IP address, Device Metadata, and KADUSERCOOKIE—from visitors to the Website, it is a "pen register" for the purposes of CIPA § 638.50(b).

108.     The PubMatic Tracker is also a "pen register" because its KADUSERCOOKIE is used to ascertain the identity of the user communicating with the Website, and thus constitutes "addressing" information.

### 3.     The Bounce Exchange Tracker

109.     Wunderkind Corp. f/k/a BounceX ("Wunderkind") is registered data broker in California.[63]  Wunderkind develops, owns, and operates the Bounce Exchange Tracker, which it provides to website owners, like Defendant, for a fee.

110.     According to Wunderkind, "Wunderkind's custom [ad] placements are designed to fit both our advertiser and publishing partners' needs."[64]  Wunderkind boasts that "[a] Wunderkind Ad experience drives results."[65]

111.     Wunderkind collects personal information including but not limited to "[b]rowsing history, search history, [and] information on a consumer's interaction with a website, application, or advertisement" and "may transfer data collected through … [Wunderkind's] marketing activities to entities such as "(i) website analytics vendors, who collect cookie and website engagement information to help understand website performance, (ii) advertising vendors, who collect cookie and website engagement information to target relevant advertising, and (iii) email marketing and lead database vendors, who collect email address and other personal information to improve email marketing efforts."[66]

---

[63]  DATA BROKER REGISTRATION FOR WUNDERKIND CORPORATION, https://oag.ca.gov/data-broker/registration/191359.

[64]  *Advertising Solutions for Advertisers and Publishers*, WUNDERKIND, https://www.wunderkind.co/how-it-works/advertising-solutions-for-advertisers-and-publishers/ (last visited Jan. 22, 2024).

[65]  *Id.*

[66]  *Privacy Policy*, WUNDERKIND, https://www.wunderkind.co/privacy/ (last visited Jan. 22, 2024).

112.    As described in more detail below, Wunderkind compiles comprehensive user profiles by tracking users across the Internet.   Wunderkind then enriches the information of its client's end users (like Defendant's end users) with the profile data to make that information more valuable to advertisers, thereby driving Defendant's revenue.   To achieve this, Wunderkind uses its Tracker to receive, store, and analyze information collected from website visitors, such as visitors of Defendant's Website.

113.    Similar to the above, the first time a user visits Defendant's Website, the user's browser sends an HTTP request to Defendant's server, and Defendant's server sends an HTTP response with directions to install the Bounce Exchange Tracker on the user's browser.   The Bounce Exchange Tracker, in turn, instructs the user's browser to send Wunderkind the user's IP address and Device Metadata.

**Figure 14:**

1    114.    Moreover, Wunderkind stores cookies with the user's IP address and Device
2    Metadata in the user's browser cache.  When the user subsequently visits Defendant's Website, the
3    Bounce Exchange Tracker locates the cookie identifiers stored on the user's browser.  If the cookies
4    are stored on the browser, the Bounce Exchange Tracker causes the browser to send the cookies
5    along with the user's IP address and Device Metadata to Wunderkind:

6    **Figure 15:**



7
8
9
10
11
12
13

14    115.    Using these cookies, the IP address, and Device Metadata, Wunderkind can track and
15    identify Website users across the Internet.  A general diagram of this process is pictured as Figure 5.

16    116.    If the user clears his or her cookies, then the user wipes out the PubMatic Tracker
17    from its cache.  Accordingly, the next time the user visits Defendant's Website the process begins
18    over again: (i) Defendant's server installs the Bounce Exchange Tracker on the user's browser,
19    (ii) the Bounce Exchange Tracker instructs the browser to send Wunderkind the user's IP address
20    and Device Metadata, (iii) the Bounce Exchange Tracker stores cookies in the browser cache, and
21    (iv) Wunderkind will continue to receive the user's IP address and Device Metadata on subsequent
22    Website visits with the cookie transmission.

23    117.    In all cases, however, Wunderkind receives a user's IP address, Device Metadata, and
24    unique user cookies every time its Tracker is loaded by the Website.

25    118.    The Bounce Exchange Tracker is at least a "process" because it is "software that
26    identifies consumers, gathers data, and correlates that data."  *Greenley*, 684 F. Supp. 3d at 1050.

27
28

119.    Further, the Bounce Exchange Tracker is a "device" because "in order for software to work, it must be run on some kind of computing device." *James*, 701 F. Supp. 3d at 952.

120.    Because the Wunderkind Tracker captures the outgoing information—the IP address, Device Metadata, and unique user cookies—from visitors to websites, it is a "pen register" for the purposes of CIPA § 638.50(b).

121.    The Wunderkind Tracker is also a "pen register" because its unique user cookies are used to ascertain the identity of the user communicating with the Website, and thus constitute "addressing" information.

### III.    DEFENDANT'S CONDUCT CONSTITUTES AN INVASION OF PLAINTIFF'S AND CLASS MEMBERS' PRIVACY

122.    The collection of Plaintiff's and Class Members' personally identifying, de-anonymized information through Defendant's installation and use of the Trackers constitutes an invasion of privacy.

123.    As alleged herein, the Trackers are designed to conduct targeted advertising and boost Defendant's revenue, all through their surreptitious collection of Plaintiff's and Class Members' personal information.

124.    To put the invasiveness of Defendant's violations of the CIPA into perspective, it is also important to understand three concepts: data brokers, real-time bidding, and cookie syncing.

125.    In short, the import of these concepts is that: (i) the Third Parties are data brokers (or partner with data brokers) that collect user information from Website visitors to uniquely identify and de-anonymize users by combining their IP addresses, Device Metadata, and unique user ID values with whatever information those Third Parties have on a user from other sources; (ii) the Third Parties share that information with other entities to create the most complete user profile they can (through cookie syncing), which includes a more complete and non-anonymous portrait of the user; and (iii) those profiles are offered up for sale through the real-time bidding process to the benefit of Defendant and the Third Parties and to the detriment of users' privacy interests.

### A.  Data Brokers And Real-Time Bidding: The Information Economy

#### 1.  Data Brokers

126.  While "[t]here is no single, agreed-upon definition of data brokers in United States law,"[67] California law defines a "data broker" as "a business that knowingly collects and sells to third parties the personal information of a consumer with whom the business does not have a direct [*i.e.*, consumer-facing] relationship," subject to certain exceptions.  Cal. Civ. Code § 1798.99.80(c).

127.  Any entity that qualifies as a "data broker" under California law must specifically register as such Cal. Civ. Code § 1798.99.82(a), which both Wunderkind[68] and PubMatic[69] do.

128.  "Data brokers typically offer pre-packaged databases of information to potential buyers," either through the "outright s[ale of] data on individuals" or by "licens[ing] and otherwise shar[ing] the data with third parties."[70]  Such databases are extensive, and can "not only include information publicly available [such as] from Facebook but also the user's exact residential address, date and year of birth, and political affiliation," in addition to "inferences [that] can be made from the combined data."[71]

129.  For instance, the NATO report noted that data brokers collect two sets of information: "observed and inferred (or modelled)."  The former "is data that has been collected and is actual," such as websites visited."  Inferred data "is gleaned from observed data by modelling or profiling," meaning what users may be *expected* to do.  On top of this, "[b]rokers typically collect not only what they immediately need or can use, but hoover up as much information as possible to compile comprehensive data sets that might have some future use."[72]

---

[67] SHERMAN, *supra*, at 2.

[68] DATA BROKER REGISTRATION FOR WUNDERKIND CORPORATION, https://oag.ca.gov/data-broker/registration/191359.

[69] DATA BROKER REGISTRATION FOR PUBMATIC, INC., https://oag.ca.gov/data-broker/registration/186702.

[70] SHERMAN, *supra*, at 2.

[71] Tehila Minkus et al., *The City Privacy Attack: Combining Social Media and Public Records for Detailed Profiles of Adults and Children*, COSN '15: PROCEEDINGS OF THE 2015 ACM ON CONFERENCE ON ONLINE SOCIAL NETWORKS 71, 71 (2015), https://dl.acm.org/doi/pdf/10.1145/2817946.2817957.

[72] TWETMAN & BERGMANIS-KORATS, *supra*, at 11.

130.    Likewise, a report by the Duke Sanford Cyber Policy Program "examine[d] 10 major data brokers and the highly sensitive data they hold on U.S. individuals."[73]  The report found that "data brokers are openly and explicitly advertising data for sale on U.S. individuals' sensitive demographic information, on U.S. individuals' political preferences and beliefs, on U.S. individuals' whereabouts and even real-time GPS locations, on current and former U.S. military personnel, and on current U.S. government employees."[74]

131.    This data collection has grave implications for Americans' right to privacy.    For instance, "U.S. federal agencies from the Federal Bureau of Investigation [] to U.S. Immigration and Customs Enforcement [] purchase data from data brokers—without warrants, public disclosures, or robust oversight—to carry out everything from criminal investigations to deportations."[75]

132.    As another example:

> Data brokers also hold highly sensitive data on U.S. individuals such as race, ethnicity, gender, sexual orientation, immigration status, income level, and political preferences and beliefs (like support for the NAACP or National LGBTQ Task Force) that can be used to directly undermine individuals' civil rights.  Even if data brokers do not explicitly advertise these types of data (though in many cases they do), everything from media reporting to testimony by a Federal Trade Commission commissioner has identified the risk that data brokers use their data sets to make "predictions" or "inferences" about this kind of sensitive information (race, gender, sexual orientation, etc.) on individuals.

> This data can be used by commercial entities within the U.S. to discriminately target goods and services, akin to how Facebook advertising tools allow advertisers to exclude certain groups, such as those who are identified as people with disabilities or those who are identified as Black or Latino, from seeing advertisements. 59 Many industries from health insurance to life insurance to banking to e-commerce purchase data from data brokers to run advertisements and target their services.

> …

> Given identified discrimination problems in machine learning algorithms, there is great risk of these predictive tools only further

---

[73] SHERMAN, *supra*, at 1.

[74] *Id.*

[75] *Id.* at 9.

driving up costs of goods and services (from insurance to housing) for minority groups.[76]

133.    Similarly, as the report from NATO noted, corporate data brokers cause numerous privacy harms, including but not limited to depriving users of the right to control who does and does not acquire their personal information, unwanted advertisements that can even go as far as manipulating viewpoints, and spam and phishing attacks.[77]

**Figure 16:**



---

[76] *Id*.

[77] Twetman & Bergmanis-Korats, *supra*, at 8.

134.    As noted above, data brokers, like Wunderkind and PubMatic, are able to compile such wide swaths of information in part by collecting users' IP addresses and Device Metadata, which is used by data brokers, like Wunderkind and PubMatic, to track users across the Internet.[78]

135.    Indeed, as McAfee (a data security company) notes, "data brokers can … even place trackers or cookies on your browsers … [that] track your IP address and browsing history, which third parties can exploit."[79]

136.    These data brokers will then:

> take that data and pair it with other data they've collected about you, pool it together with other data they've got on you, and then share all of it with businesses who want to market to you. They can eventually build large datasets about you with things like: "browsed gym shorts, vegan, living in Los Angeles, income between $65k-90k, traveler, and single." Then, they sort you into groups of other people like you, so they can sell those lists of like-people and generate their income.[80]

137.    In short, by collecting IP addresses and Device Metadata, data brokers like PubMatic, Wunderkind, and many of the entities the Third Parties sync with can track users across the Internet, compiling various bits of information about users, building comprehensive user profiles that include an assortment of information, interests, and inferences, and offering up that information for sale to the highest bidder.  The "highest bidder" is a literal term, as explained below.

138.    As a result of Defendant's installation the trackers of data brokers like PubMatic, Wunderkind, and many of the entities the Third Parties sync with on the browsers of users of Defendant's Website, the information of Plaintiff and Class Members is linked to any profiles these data brokers may have about them using their IP addresses and Device Metadata (or new profiles are created for Plaintiff and Class Members).

139.    These profiles are then served up to any companies that want to advertise on Defendant's Website, and Defendant's users become more valuable as a result of having their IP

---

[78] *Id.* at 11.

[79] Jasdev Dhaliwal, *How Data Brokers Sell Your Identity*, MCAFEE (June 4, 2024), https://www.mcafee.com/blogs/tips-tricks/how-data-brokers-sell-your-identity/.

[80] Paul Jarvis, *The Problem with Data Brokers: Targeted Ads and Your Privacy*, FATHOM ANALYTICS (May 10, 2022), https://usefathom.com/blog/data-brokers.

addresses and Device Fingerprint Information linked to these data broker profiles. Thus, Defendant is unjustly enriched through advertising revenue by installing the Trackers on Plaintiff's and Class Members' browsers, and thus, enabling the Third Parties to collect Plaintiff's and Class Members' IP addresses and Device Metadata without consent.

  2.   *Real-Time Bidding*

140.   So, once data brokers like PubMatic, Wunderkind, and many of the entities the Third Parties sync with collect Website users' IP addresses and Device Metadata, how do they "sell" or otherwise help Defendant monetize that information? This is where real-time bidding comes in.

141.   "Real Time Bidding (RTB) is an online advertising auction that uses sensitive personal information to facilitate the process to determine which digital ad will be displayed to a user on a given website or application."[81]

142.   "There are three types of platforms involved in an RTB auction: Supply Side Platforms (SSPs), Advertising Exchanges, and Demand Side Platforms (DSPs)." An SSP, which is at least one function of the PubMatic Tracker here,[82] "work[s] with website or app publishers to help them participate in the RTB process." "DSPs [which is what the ADNXS Tracker is[83]] primarily work with advertisers to help them evaluate the value of user impressions and optimize the bid prices they put forth."[84] And an Advertising Exchange "allows advertisers and publishers to use the same technological platform, services, and methods, and 'speak the same language' in order to exchange data, set prices, and ultimately serve an ad."[85]

143.   In other words, SSPs like the PubMatic Tracker provide user information to advertisers that might be interested in those users, DSPs like the ADNXS Tracker help advertisers

---

[81] Sara Geoghegan, *What is Real Time Bidding?*, ELECTRONIC PRIVACY INFORMATION CENTER (Jan. 15, 2025), https://epic.org/what-is-real-time-bidding/.

[82] *See*, *e.g.*, PUBMATIC SSP, https://pubmatic.com/products/pubmatic-ssp-for-publishers/

[83] MICROSOFT INVEST, https://about.ads.microsoft.com/en/solutions/technology/microsoft-invest-dsp ("Microsoft Invest is a demand-side platform built for the future of video advertising.").

[84] Geoghegan, *supra*.

[85] *Introducing To Ad Serving*, MICROSOFT IGNITE (Mar. 3, 2024), https://learn.microsoft.com/en-us/xandr/industry-reference/introduction-to-ad-serving.

select which users to advertise and target, and an Advertising Exchange is the platform on which all of this happens.

144.    The RTB process works as follows:

> After a user loads a website or app, an SSP [here, PubMatic] will send user data to Advertising Exchanges … The user data, often referred to as "bidstream data," contains information like device identifiers, IP address, zip/postal code, GPS location, browsing history, location data, and more. After receiving the bidstream data, an Advertising Exchange will broadcast the data to several DSPs [here, Microsoft]. The DSPs will then examine the broadcasted data to determine whether to make a bid on behalf of their client.

> Ultimately, if the DSP wins the bid, its client's advertisement will appear to the user. Since most RTB auctions are held on the server/exchange side, instead of the client/browser side, the user only actually sees the winner of the auction and would not be aware of the DSPs who bid and lost. But even the losing DSPs still benefit because they also receive and collect the user data broadcasted during the RTB auction process. This information can be added to existing dossiers DSPs have on a user.[86]

**Figure 17:**



145.    Facilitating this real-time bidding process means SSPs and DSPs must have as much information as possible about Defendant's users to procure the greatest interest from advertisers and the highest bids. These entities receive assistance because Defendant also installs the trackers of data brokers on its users' browsers:

---

[86] Geoghegan, *supra*; *see also* REAL-TIME BIDDING, APPSFLYER, https://www.appsflyer.com/glossary/real-time-bidding/.

the economic incentives of an auction mean that DSP [or SSP] with more specific knowledge of individuals will win desirable viewers due to being able to target them more specifically and out-bid other entities. As a consequence, the bid request is not the end of the road. The DSP enlists a final actor, the data management platform (DMP) [or a data broker]. DSPs [or SSPs] send bid requests to DMPs [and data brokers], who enrich them by attempting to identify the user in the request and use a variety of data sources, such as those uploaded by the advertiser, collected from other sources, or bought from data brokers. The DSP with the highest bid not only wins the right to deliver the ad—through the SSP—to the individual. The DSP also wins the right to cookie sync its own cookies with those from the [Advertising Exchange], thus enabling easier linkage of the data to the user's profile in the future.[87]

**Figure 18:**



146.    In other words, a SSP like PubMatic can solicit the highest bids for Website users by identifying and de-anonymizing those users by combining the information PubMatic knows about that user with the information other data brokers know about that user. If there is a match, then PubMatic will have significantly more information to provide about users, and that will solicit significantly higher bids from prospective advertisers (because the advertisers will have more information about the user to target their bids).

147.    Likewise, a DSP like Microsoft can generate the highest and most targeted bids from advertisers with providing those advertisers with as much information about users as possible, which

---

[87] Michael Veale & Federik Zuiderveen Borgesius, *Adtech and Real-Time Bidding under European Data Protection Law*, 23 GERMAN L. J. 226, 232-33 (2022) https://tinyurl.com/yjddt5ey.

it does by syncing with Tapad/Experian and PubMatic—who in turn, sync with other data brokers and/or are data brokers themselves.

148.    All of this naturally enriches Defendant, as its users have now become more valuable thanks to the replete information the Third Parties are able to provide about users.

149.    As the Federal Trade Commission ("FTC") has noted, "[t]he use of real-time bidding presents potential concerns," including but not limited to:

> (i)    "incentiviz[ing] invasive data-sharing" by "push[ing] publishers [*i.e.*, Defendant] to share as much end-user data as possible to get higher valuation for their ad inventory—particularly their location data and cookie cache, which can be used to ascertain a person's browsing history and behavior."
>
> (ii)   "send[ing] sensitive data across geographic borders."
>
> (iii)  sending consumer data "to potentially dozens of bidders simultaneously, despite only one of those parties—the winning bidder actually using that data to serve a targeted ad. Experts have previously cautioned that there are few (if any) technical controls ensuring those other parties do not retain that data for use in unintended ways."[88]

150.    Given Microsoft operates a DSP here, the last point is particularly relevant, as it means Microsoft—through the ADNXS Tracker—collects and discloses Website users' information to *all prospective advertisers*, even if advertisers do not ultimately show a user an advertisement. This greatly diminishes the ability of users to control their personal information.

151.    Likewise, the Electronic Privacy Information Center ("EPIC") has warned that "[c]onsumers' privacy is violated when entities disclose their information without authorization or in ways that thwart their expectations."[89]

152.    For these reasons, some have characterized "real-time bidding" as "[t]he biggest data breach ever recorded" because of the shear number of entities that receive personal information[90]:

---

[88] Federal Trade Commission, Unpacking Real Time Bidding through FTC's case on Mobilewalla (Dec. 3, 2024), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2024/12/unpacking-real-time-bidding-through-ftcs-case-mobilewalla.

[89] Geoghegan, *supra*.

[90] Dr. Johnny Ryan, "RTB" Adtech & GDPR, https://assortedmaterials.com/rtb-evidence/ (video).

1

**Figure 19:**



153.    All of this is in line with protecting the right to determine who does and does not get to know one's information, a harm long recognized at common law and one the CIPA was enacted to protect against. *Ribas v. Clark*, 38 Cal. 3d 355 361 (1985) (noting the CIPA was drafted with a two-party consent requirement to protect "the right to control the nature and extent of the firsthand dissemination of [one's] statements"); *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press* 489 U.S. 749, 763-64 (1989) ("[B]oth the common law and the literal understandings of privacy encompass the individual's control of information concerning his or her person.").

       3.    *Cookie Syncing*

154.    It should now be clear both the capabilities of the Third Parties (*i.e.*, data brokers who de-anonymize users, or companies who sync with data brokers for this purpose) and the reasons Defendant installs their Trackers on its Website (to sell to advertisers in real-time bidding with as much information about users as possible to solicit the highest bids). The final question is how do these Third Parties share information amongst each other and with others to offer the most complete user profiles up for sale? This occurs through "cookie syncing."

155. Cookie syncing is a process that "allow[s] web companies to share (synchronize) cookies, and match the different IDs they assign for the same user while they browse the web."[91] This allows entities like the Third Parties to circumvent "the restriction that sites can't read each other cookies, in order to better facilitate targeting and real-time bidding."[92]

156. Cookie syncing works as follows:

> Let us assume a user browsing several domains like website1.com and website2.com, in which there are 3rd-parties like tracker.com and advertiser.com, respectively. Consequently, these two 3rd-parties have the chance to set their own cookies on the user's browser, in order to re-identify the user in the future. Hence, tracker.com knows the user with the ID user123, and advertiser.com knows the same user with the ID userABC.

> Now let us assume that the user lands on a website (say website3.com), which includes some JavaScript code from tracker.com but not from advertiser.com. Thus, advertiser.com does not (and cannot) know which users visit website3.com. However, *as soon as the code of tracker.com is called, a GET request is issued by the browser to tracker.com (step 1), and it responds back with a REDIRECT request (step 2), instructing the user's browser to issue another GET request to its collaborator advertiser.com this time, using a specifically crafted URL (step 3).*

> …

> When advertiser.com receives the above request along with the cookie ID userABC, it finds out that userABC visited website3.com. *To make matters worse, advertiser.com also learns that the user whom tracker.com knows as user123, and the user userABC is basically one and the same user.* Effectively, CSync enabled advertiser.com to collaborate with tracker.com, in order to: (i) find out which users visit website3.com, and (ii) *synchronize (i.e., join) two different identities (cookies) of the same user on the web.*[93]

---

[91] Panagiotis Papadopoulos et al., *Cookie Synchronization: Everything You Always Wanted to Know But Were Afraid to Ask*, 1 WWW '19: THE WORLD WIDE WEB CONFERENCE 1432, 1432 (2019), https://dl.acm.org/doi/10.1145/3308558.3313542.

[92] Gunes Acar et al., *The Web Never Forgets: Persistent Tracking Mechanisms in the Wild*, 6B CCS'14: ACM SIGSAC CONFERENCE ON COMPUTER AND COMMUNICATIONS SECURITY 674, 674 (2014)

[93] Papadopoulos, *supra*, at 1433.

**Figure 20:**



157.    Through this process, third party trackers are not only able to resolve user identities (*e.g.*, learning that who Third Party #1 knew as "userABC" and Third Party #2 knew as "user123" are the same person), they can "track a user to a much larger number of websites," even though that "do not have any collaboration with" the third party.[94]

158.    On the flip side, "CSync may re-identify web users even after they delete their cookies."[95] "[W]hen a user erases her browser state and restarts browsing, trackers usually place and sync a new set of userIDs, and eventually reconstruct a new browsing history."[96] But if a tracker can "respawn" its cookie or like to another persistent identifier (like an IP address), "then through CSync, all of them can link the user's browsing histories from before and after her state erasure.

---

[94] Papadopoulos, *supra*, at 1434.

[95] *Id.*

[96] *See id.*

Consequently: (i) users are not able to abolish their assigned userIDs even after carefully erasing their set cookies, and (ii) trackers are enabled to link user's history across state resets."[97]

159. Thus, "syncing userIDs of a given user increases the user identifiability while browsing, thus reducing their overall anonymity on the Web."[98]

160. Cookie syncing is precisely what is happening here. When each of the Trackers are installed on Website users' browsers, they are calling and/or syncing their cookies with other third parties on the Website (*e.g.*, Experian, Epsilon, TransUnion, the Third Parties between one another). The result of this process is not only that a single user is identified as one person by these multiple third parties, but they share all of the information about that user with one another (because the cookie is linked to a specific user profile). This prevents users from actually being anonymous when they visit the Website.

*    *    *

161. To summarize the proceeding allegations, PubMatic and Wunderkind are data brokers that focus on collecting as much information about Website users as possible to create comprehensive user profiles, and Microsoft syncs with numerous other data brokers that do the same. The Third Parties collect IP Addresses, Device Metadata, and unique user IDs in the first instance, but those pieces of information are connected to information the Third Parties glean from other sources (*e.g.*, various data brokers) to build comprehensive profiles. Through "cookie syncing," those profiles are shared amongst the Third Parties and with other entities to form the most fulsome picture with the most attributes as possible. And those profiles are offered up for sale to interest advertisers through real-time bidding using the Third Parties' trackers, where users will command more value the more advertisers know about a user.

162. Thus, the Third Parties enrich the value Defendant's users would otherwise command by tying the data they obtain directly from users on the Website (*e.g.*, IP addresses, Device Metadata, unique user IDs) with comprehensive user profiles.

---

[97] *Id.*

[98] *Id.* at 1441.

163.    Accordingly, Defendant is using the Trackers in conjunction with the Third Parties to (i) de-anonymize users, (ii) offer its users up for sale in real-time bidding, and (iii) monetize its Website by installing the Trackers and allowing the Third Parties to collect as much information about Website users as possible (without consent).

164.    Thus, Defendant is unjustly enriched through their installation and use of the Trackers, which causes data to be collected by Third Parties without Plaintiff's and Class Members' consent, and that enable the Third Parties to sell Defendant's user inventory in an ad-buying system. In addition, Plaintiff and Class Members lose the ability to control their information, as their information ends up in the hands of data brokers, advertising inventory sellers, and a virtually unlimited number advertisers themselves without knowledge or consent.

**B.    Defendant Uses The ADNXS Tracker For Targeted Advertising And Data Monetization**

165.    Microsoft describes its advertising services, which include the ADNXS or Microsoft Invest Tracker, as "a strategic buying platform built for the needs of today's advertisers looking to invest in upper-funnel buying and drive business results."[99]  The ADNXS Tracker is a DSP as noted above.

166.    Microsoft collects data to help companies with their marketing; when the processing system "receives ad requests, [it] applies data to the request, receives bids, makes decisions, serves creatives, logs, auctions, etc."[100]

167.    In particular:

> The Microsoft Advertising platform is a real-time bidding system and ad server. The main processing system is called the "impression bus." The impression bus receives ad requests, applies data to the request, receives bids, makes decisions, serves creatives, logs auctions, etc.
>
> Ad calls come in via our inventory supply partners: exchanges, SSPs, ad networks, and a few valued publishers.
>
> …

---

[99] *About Microsoft Invest*, MICROSOFT IGNITE (Feb. 12, 2024), https://learn.microsoft.com/en-us/xandr/invest/about-invest (last visited Dec. 23, 2024).

[100] *Id.*

> Once we get the call, we overlay segment data from our server-side cookie store.  Data is added to the cookie store either through Xandr segment pixels or by clients sending us a file of data.  We also contact third-party data providers and overlay any available data.
>
> We contact all of the bidders on our platform. The ad call includes whatever user data belongs to each bidder, and information about the inventory. Bidders have a certain number of milliseconds in which to respond with a bid and the creative they want to serve.
>
> …
>
> The impression bus decides which bid wins based on the amount of the bid, and any preferences the publisher has about what they want served on their page. If the call was client-side, Microsoft Advertising serves the ad. If it was server-side, Microsoft Advertising passes the bid and the location of the creative to the partner who will ultimately serve the ad. [101]

168.    Microsoft Invest (*i.e.*, the ADNXS Tracker) provides "targeting, bidding algorithms, multi-currency support, and all the other features of a premium ad server."[102]  To do this, Microsoft utilizes data from its cookie store.  The "[d]ata is added to the cookie store either through Microsoft Advertising segment pixels or by clients sending [them] a file of data. [They] also contact third-party data providers and overlay any available data."[103]

169.    Microsoft also integrates with the Bounce Exchange Tracker on Defendant's Website to enrich Defendant's user data and therefore obtain higher bids to show advertisements to Defendant's users.  And Microsoft discloses all of this information to advertisers that bid on Defendant's users, regardless of whether the advertiser actually wins the bid.

170.    Further, Microsoft utilizes data from its cookie store.  The "[d]ata is added to the cookie store either through Microsoft Advertising segment pixels or by clients sending [them] a file of data.  [They] also contact third-party data providers and overlay any available data."[104]

171.    In other words, when users visit Defendant's Website, Microsoft collects users' IP addresses and Device Metadata through its ADNXS Tracker to provide to advertisers interested in

---

[101] https://learn.microsoft.com/en-us/xandr/invest/about-invest

[102] *About Microsoft Invest*, MICROSOFT IGNITE (Feb. 12, 2024), https://learn.microsoft.com/en-us/xandr/invest/about-invest

[103] *Id.*

[104] *Id.*

showing an advertisement to Defendant's Website users, enriching that information by integrating with the Bounce Exchange Tracker (and its own data), and ultimately enabling Defendant to monetize its Website and maximize revenue by enabling Microsoft to collect as much information about Defendant's users as possible.

### C. Defendant Uses The PubMatic Tracker For Targeted Advertising, Identity Resolution, And Data Monetization

172.    As noted above, PubMatic is a registered data broker in California that describes itself as a digital advertising platform that "exist[s] to enable content creators to run a more profitable advertising business, which in turn allows them to invest back into the multi-screen and multi-format content that consumers demand."[105]

173.    PubMatic helps companies like Defendant monetize the data of Website users.  As noted above, PubMatic is a "supply side platform" that helps website operators like Defendant "[m]aximize advertising revenue and control how your audiences are accessed."[106]

174.    To do this, PubMatic provides a "unique, supply path optimized and addressable brand demand—from the SSP of choice for the top advertisers and agencies in the world."[107]

**Figure 21:**



---

[105] *The Supply Chain Of The Future. Delivered*, PUBMATIC, https://pubmatic.com/about-us (last visited Jan. 18, 2024).

[106] PUBMATIC SSP, https://pubmatic.com/products/pubmatic-ssp-for-publishers/.

[107] *Id.*

175.    Likewise, PubMatic provides identity resolution the "Identity Hub" service, "a leading ID management tool for publishers that leverages specialized technology infrastructure to simplify the complex alternative identifier marketplace."[108]  Notably, this allows website operators like Defendant to "drive monetization in cookie-restricted environments" by "[c]onnect[ing] seamlessly with buyers to drive programmatic revenue."[109]

176.    Notably, PubMatic also touts its ability to integrate with multiple other third parties—including "over 75 identity and data providers"—"leverage leading identifiers" to "help data owners [like Defendant] driver monetization and help media buyers [*i.e.*, advertisers] drive performance"[110]:

**Figure 22:**



177.    While PubMatic enables website operators like Defendant to sell their users to advertisers with a variety of characteristics, one of those characteristics is, notably, geography:

---

[108] IDENTITY HUB, https://pubmatic.com/products/identity-hub/.

[109] *Id.*

[110] *Id.*

**Figure 23:**



178.    PubMatic also helps advertisers select where to place their ads, to help companies "[s]mash [their] campaign KPIs [key performance indicators]" and "reach [their] target audiences more effectively."[111]    One of the ways in which PubMatic accomplishes this is by selling "action packages," which are data sets—pulled together from different sources—to help advertisers target specific customers.[112]    In other words, PubMatic utilizes third-party data, as well as data from the publisher where the ad is ultimately placed (*i.e.*, first-party), to determine where to place advertisers' ads and who to place them in front of.

179.    By way of example, PubMatic sells a "Ramadan Auction Package" that targets consumers who observe Ramadan.[113]    This package helps companies target people who have

---

[111] *Connect With PubMatic's Auction Packages*, PUBMATIC, https://pubmatic.com/auction-packages (last visited Jan. 18, 2024).

[112] *Connect With PubMatic's Auction Packages*, PUBMATIC, https://pubmatic.com/auction-packages-apac (last visited Jan. 18, 2024).

[113] *Connect With PubMatic's Auction Packages: Ramadan*, PUBMATIC, https://pubmatic.com/auction-packages-apac (last visited Jan. 18, 2024).

indicated interest in Ramadan Events through consumer behavior, have internet search history such as "Prayer & Fasting," have location data that is "[f]requently seen at places of worship," or have "[d]emographic data" that shows they are married or live with people "who have shown interest towards Ramadan."[114]

180.    Thus, when users visit Defendant's Website, PubMatic collects users' IP addresses through its PubMatic Tracker so that Defendant can identify its users with PubMatic's suite of identity resolution services, sell its users to prospective advertisers, and ultimately reap substantial revenue through the programmatic advertising PubMatic assists with. All of this helps Defendant monetize its Website and maximize revenue by enabling PubMatic to collect as much information about Defendant's users as possible.

### D.    Defendant Uses The Bounce Exchange Tracker For Targeted Advertising, Identity Resolution, And Data Monetization

181.    As noted above, Wunderkind is a registered data broker in California that describes itself as "a performance marketing engine that recognizes more of your website traffic"[115] and "drives guaranteed revenue for the world's top brands."[116]

182.    Specifically, Wunderkind claims to "offer[] dozens of behavioral triggers and segmentation options for sending more emails and text messages that drive efficient (and guaranteed) revenue performance."[117]  "By expertly personalizing, automating, and scaling beautiful one-to-one experiences, Wunderkind helps brands [like Defendant] acquire new customers at scale and keep them loyal for life."[118]

183.    To do so, Wunderkind's technology "recognizes [clients'] website traffic" (*i.e.*, who each individual user is), so that clients can serve targeted ads.[119]  Wunderkind "host[s] the largest

---

[114] *Id.*

[115] GET STARTED WITH WUNDERKIND, https://www.wunderkind.co/marketing-get-started/ (last visited Jan. 28, 2025).

[116] *About Us*, WUNDERKIND, https://www.wunderkind.co/about-us/ (last visited Jan. 22, 2025).

[117] GET STARTED WITH WUNDERKIND.

[118] *About Us*, WUNDERKIND.

[119] *Wunderkind Drives Unmatched Revenue*, WUNDERKIND, https://www.wunderkind.co/performance-marketing-solutions-for-ecommerce/ (last visited Jan. 22, 2025).

first-party data set out of comparable solution[s] on the market."[120]  As noted above, Wunderkind

provides that data set to companies interested in showing advertisements to Defendant's Website

users through the RTB process, in addition to maintaining those profiles for its own purposes.

184.    Wunderkind's data set "recognizes over 9 billion consumer devices and 1 billion

consumer profiles and stores them in [its] database."[121]

**Figure 24:**



185.    Wunderkind does this by matching whatever information it has on file about users

with the information it collects, receives, stores, and analyzes through its Bounce Exchange Tracker.

The Bounce Exchange Tracker "analyze[s] everything about visitor behavior, from purchase history

to traffic sources to engagement patterns to even the moment a visitor is abandoning a site using its

patented exit-intent technology," and "then uses that information to inform a variety of customer

---

[120] *Id.*

[121] *Id.*

acquisition strategies designed to dramatically boost key business metrics for [Wunderkind's] clients."[122]

186.    In other words, when users visit Defendant's Website, Wunderkind collects users' IP addresses through its Bounce Exchange Tracker to so that Defendant can analyze user data, create and analyze the performance of marketing campaigns, and target specific users or specific groups of users for advertisements.  All of this helps Defendant monetize its Website and maximize revenue by enabling Wunderkind to collect as much information about Defendant's users as possible.

## IV.    PLAINTIFF'S EXPERIENCE

187.    Plaintiff regularly visited the Websites on her desktop browser—as long ago as 2017 and as recently as December 2024—and has done so throughout the entirety of the class period.

188.    When Plaintiff visited the Website, the Website's code—as programmed by Defendant—caused the Trackers to be installed on Plaintiff's browser.  *See* Figures 4, 10, 14, *supra*.

189.    Through their respective Trackers, the Third Parties collected Plaintiff's IP address, Device Metadata, and set a cookie with a unique user ID that allowed the Third Parties to pervasively track Plaintiff across multiple Website sessions and even other websites, as well as de-anonymize Plaintiff by synchronizing her user profile amongst each other and with other entities.  *See* Figures 6-9, 11-13, 15, 24, *supra*.

190.    Defendant and the Third Parties used the information collected by the Trackers to:

(i)    identity Plaintiff and either create a new profile of her in the Third Parties' databases or match Plaintiff to a pre-existing profile (either in the Third Parties' own databases or with another entity's profile);

(ii)    sell Plaintiff's information to advertisers for hyper-targeted advertising based on the information collected by the Third Parties on the Website—including but not limited to Plaintiff's location information based on her IP address— and the information contained on any profiles of Plaintiff (which are linked to Plaintiff via the information collected by the Third Parties on the Website);

(iii)    actually target Plaintiff with advertisements and serve advertisements on Plaintiff based on the information

---

[122] BOUNCE EXCHANGE (PAST SPONSOR), https://etailconnectwest.wbresearch.com/sponsors/bounce-exchange.

collected by the Third Parties—including but not limited to Plaintiff's location information based on her IP address—on the Website and the information contained on any profiles of Plaintiff (which are linked to Plaintiff via the information collected by the Third Parties on the Website); and

(iv)   de-anonymize Plaintiff and generate revenue from the sale of Plaintiff's information—both what is collected on the Website by the Third Parties and the profiles this information is linked to—to advertisers, thus boosting Defendant's, advertisers', and the Third Parties' revenue and the value of the Third Parties' services.

191.   Plaintiff did not provide her prior consent to Defendant to install or use the Trackers on her browser.  Nor did Defendant obtain a court order before installing or using the Trackers.

192.   Thus, Plaintiff has had her privacy invaded by Defendant's violations of CIPA § 638.51(a), and Defendant has likewise been unjustly enriched through the Third Parties' surreptitious and unconsented-to collection of Plaintiff's data.  Accordingly, Plaintiff has been injured by Defendant's violation of the CIPA.

## V.   DEFENDANT IS SUBJECT TO JURISDICTION IN CALIFORNIA

193.   Defendant purposefully directed its conduct at California residents.  Defendant took the intentional act of installing the Trackers (pen registers) on its users' browsers.  This is so because Defendant programmed the code of its Website to install the Trackers, Defendant entered agreements with each of the Third Parties operating the Trackers for the provision of said Trackers, and Defendant used and profited off of the information surreptitiously and unlawfully collected by the Third Parties operating the Trackers.

### A.   Defendant's Website Is Hosted In California, And Defendant Employs CDNs In California To Speed Up Delivery To California Users

194.   Defendant expressly aimed its conduct at California.  As an initial matter, performing an "nsLookup" for mashable.com using Windows PowerShell reveals the IP addresses associated with the mashable.com domain, which are pictured below[123]:

---

[123] Two of the IP addresses (the "2606" IP addresses) are listed in IPv6 versus IPv4.

1

**Figure 25:**

2

3

```
Name:     mashable.com
Addresses:  2606:4700:4400::ac40:91ef
            2606:4700:4400::6812:2a11
            104.18.42.17
            172.64.145.239
```

4

5

6      195.    Windows PowerShell is a way to access command-line tools in Microsoft Windows

7  and come pre-packaged with Microsoft Windows computers.[124]  "Nslookup, which stands for 'Name

8  Server Lookup,' is a command-line tool used to query Domain Name System (DNS) servers.  It helps

9  users obtain information about domain names, IP (Internet Protocol) addresses, and DNS records,"

10  including finding "the IP address associated with a domain."[125]

11      196.    Looking up the geolocation for each of these IP addresses associated with the

12  mashable.com domain on https://www.ip2location.com reveals that each of the IP addresses

13  associated with the mashable.com domain are located in San Francisco and assigned to CloudFlare,

14  which is a San Francisco-based company:

15      **Figure 26:**

16

| ☑ IP Address | 2606:4700:4400:0:0:0:ac40:91ef |
|---|---|
| ☐ Country | United States of America [US] |
| ☐ Region | California |
| ☐ City | San Francisco |
| ☐ Coordinates of City ⓘ | 37.774930, -122.419420 (37°46'30"N  122°25'10"W) |
| ☐ ISP | CloudFlare Inc. |

| ☑ IP Address | 2606:4700:4400:0:0:0:6812:2a11 |
|---|---|
| ☐ Country | United States of America [US] |
| ☐ Region | California |
| ☐ City | San Francisco |
| ☐ Coordinates of City ⓘ | 37.774930, -122.419420 (37°46'30"N  122°25'10"W) |
| ☐ ISP | CloudFlare Inc. |

| ☑ IP Address | 104.18.42.17 |
|---|---|
| ☐ Country | United States of America [US] |
| ☐ Region | California |
| ☐ City | San Francisco |
| ☐ Coordinates of City ⓘ | 37.775700, -122.395200 (37°46'33"N  122°23'43"W) |
| ☐ ISP | CloudFlare Inc. |

| ☑ IP Address | 172.64.145.239 |
|---|---|
| ☐ Country | United States of America [US] |
| ☐ Region | California |
| ☐ City | San Francisco |
| ☐ Coordinates of City ⓘ | 37.775700, -122.395200 (37°46'33"N  122°23'43"W) |
| ☐ ISP | CloudFlare Inc. |

---

[124] WHAT IS WINDOWS POWERSHELL?, https://learn.microsoft.com/en-us/powershell/scripting/what-is-windows-powershell?view=powershell-7.5

[125] WHAT IS NSLOOKUP?, https://www.lenovo.com/us/en/glossary/what-is-nslookup/.

197.    This means that the content of the Website, including images for news stories, are loaded from servers located in California.  For instance, when Plaintiff accessed the Website in April 2024, assets for the Website (such as the images for news articles) were loaded from California-based servers, as the below transmission indicates.  The "remote IP address" for this transmission again corresponds to Cloudflare's servers in San Francisco[126]:

**Figure 27:**



198.    Notably, when Plaintiff's counsel accessed Defendant's Website in both New York City and Miami, assets for Defendant's Website were also loaded from California-based servers.  *See* Figure 28 (New York City), Figure 29 (Miami).

**Figure 28:**



---

[126] "Helios" is a CDN provided by Cloudflare.  CLOUDFLARE CONTENT DELIVERY NETWORK (CDN), https://www.helios.id/products/cloudflare-content-delivery-network-cdn/.  The image likely comes from Defendant's article on the solar eclipse in April 2024.  SOLAR ECLIPSE 2024 LIVESTREAM WEBCAMS: HOW TO WATCH, https://mashable.com/article/solar-eclipse-2024-webcams-livestream-watch.

**Figure 29:**



| | | | | |
|---|---|---|---|---|
| helios-i.mashable.com | /imagery/articles/03sqfz0CuluLVIxGqMNFw2p/hero-image.fill.size_1... | 10:43:27.644 | 50 ms | 172.64.145.239 |
| helios-i.mashable.com | /imagery/articles/05kpDAe7Xfw1jNjFmVqlze0/hero-image.fill.size_6... | 10:43:27.812 | 56 ms | 172.64.145.239 |
| helios-i.mashable.com | /imagery/articles/067RmnK8wwi8lDfbQRCOnh0/hero-image.fill.size_... | 10:43:27.812 | 57 ms | 172.64.145.239 |
| helios-i.mashable.com | /imagery/articles/07bZu4imc8DXTy86kDwOLnP/hero-image.fill.size_... | 10:43:27.812 | 54 ms | 172.64.145.239 |

199.   Further, when users access the Website, Defendant uses content delivery networks or "CDNs," which are "a group of geographically distributed servers that speed up the delivery of web content by bringing it closer to where users are."[127]   When California users like Plaintiff access the Website—as the below screenshot of traffic from Plaintiff's browser indicates—Defendant uses CDNs located in California to speed up the delivery of content to California users.

200.   The location of these CDNs is ascertainable from the "remote IP address" of the CDN, which show that each of the CDNs are variously located in the Bay Area:

**Figure 30:**

| | | | | |
|---|---|---|---|---|
| cdn.ziffstatic.com | /pg/mashable.prebid.js | 15:28:48.747 | 63 ms | 23.214.95.150 |
| cdn.ziffstatic.com | /pg/mashable.js | 15:28:48.747 | 50 ms | 23.214.95.150 |
| cdn.ziffstatic.com | /pg/mashable.css | 15:28:48.748 | 138 ms | 23.214.95.150 |

| | |
|---|---|
| ☑ **IP Address** | 23.214.95.150 |
| ☐ **Country** | 🇺🇸 United States of America [US] |
| ☐ **Region** | California |
| ☐ **City** | San Jose |
| ☐ **Coordinates of City** ❶ | 37.339390, -121.894960 (37°20'22"N  121°53'42"W) |
| ☐ **ISP** | Akamai Technologies Inc. |

---

[127] WHAT IS A CDN (CONTENT DELIVERY NETWORK)?, https://www.akamai.com/glossary/what-is-a-cdn

**Figure 31:**



201.    Notably, Akamai is a Massachusetts-based company, meaning Defendant specifically chose to purchase CDNs in California to make the delivery of Website content faster and more efficient for California residents like Plaintiff and Class Members.

**B.    Defendant Knowingly Installs The Trackers On Californians' Browsers, And Knowingly Profits From The Selling And Sharing Of Californians' Personal Information**

202.    Defendant's Website relies mostly if not entirely on advertising revenue to provide its content. As noted above, the advertising on Defendant's Website is programmatic or based on "real-time bidding," meaning Defendant generates revenue by selling or sharing Website users' data with advertisers vis-à-vis the Third Party Trackers, and advertisers pay Defendant money through the Third Party Trackers to show specific Website users specific advertisements based on that data.[128]

203.    When a user accesses the Website, Defendant knows the location of that user because Defendant also receives the user's IP address, and a user's IP address correlates to their approximate location. Thus, if a California user accesses the Website, Defendant knows the user is accessing the Website from California, knows it is installing the Trackers on a California user's browser, knows that the data of California users is being shared with and sold to advertisers, and knows that it is profiting off the data of California users. *See also* Order at 4:27-5:1 (noting Defendant "targets California residents because it knowingly enables the sale of Californians' information, which it

---

[128] The Court's Order (ECF No. 29) noted that the Third Parties "operate the[] trackers and use them to engage in targeted advertising based on website visitors' location and browsing data." Order at 2 at 2:3-4." To clarify, *Defendant* engages in targeted advertising through the installation and use of the Third Party Trackers, the Third Partys being various players in the RTB space.

obtains by installing trackers on website visitors' computers, and it earns significant revenue as a result.").

204.    Crucially, Defendant knows a user is accessing its Website from California *before* Defendant installs the Third Party Trackers on the user's browser.  Recall the technological order of operations.  *See* Figure 1, *supra*.  *First*, the user's browser communications with Defendant's Website.  Through this transmission, Defendant learns the user's IP address, and therefore, the user's location.  *Then*, Defendant's Website—as programmed by Defendant—responds with code or instructions to install the Trackers on the user's browser.  Thus, when Defendant installs the Trackers on the user's browser, Defendant knows the location that the user is accessing the Website from.

205.    As noted above, Defendant can and does configure at least the PubMatic Tracker to sell user data based specifically on their location, as derived from their IP address.  *See* Figure 23, *supra*.  Likewise, Defendant can and does enable California-specific marketing campaigns in conjunction with at least the PubMatic Tracker.  *Id.*

206.    Plaintiff was among the California residents whose information was sold to advertisers, as caused by Defendant's knowing and intentional installation of the Trackers on Plaintiff's browser.  For example, as noted above, Defendant knew Plaintiff was in California when it installed the PubMatic Tracker on her browser based on Plaintiff's IP address, and PubMatic also collected Plaintiff's IP address through its Tracker, thus revealing Plaintiff's location to PubMatic.

207.    As the below screenshot of a "bid response"[129] on Plaintiff's browser indicates, PubMatic received a bid response from Vista Print[130] (see the "adomain" parameter) to show Plaintiff an advertisement in a "banner"[131] on Defendant's Website.  The dimensions of the banner ad are

---

[129] "A bid response is the advertiser's response to a publisher's bid request.  When an advertiser decides that ad inventory offered via a bid request suits their criteria, they can respond with a bid through the RTB system.  This bid response will include details about the bid as well as information on the ad campaign and the bidder."  BID RESPONSE, SMARTCLIP, https://smartclip.tv/adtech-glossary/bid-response/.

[130] VISTA PRINT, https://www.vistaprint.com/.

[131] "Banners are the creative rectangular ads that are shown along the top, side, or bottom of a website in hopes that it will drive traffic to the advertiser's proprietary site, generate awareness, and overall brand consideration."  WHAT IS BANNER ADVERTISING?, https://advertising.amazon.com/library/guides/banner-advertising.

listed as particular pixels—the values for the "h" (height) and "w" (width) parameters. Finally, Vista Print was willing to pay Defendant approximately $0.48 CPM. CPM stands for "cost per mille," which "is a pricing model used in digital advertising, where advertisers pay the publisher a fixed price for 1,000 impressions of their ad—'mille' being Latin for 'thousand.' An impression is achieved when an ad loads on the page or app and is viewed by the user."[132] In other words, Vista Print was willing to pay Defendant as much as $0.48 for every 1,000 Website users who viewed Vista Print's advertisement. This is just one advertiser and one bid response.

**Figure 32:**

```
"bid": [{
    "id": "A35E9214-D801-4E71-9C40-AD840629F480",
    "impid": "16bb88de7d50073",
    "price": 0.480633,
    "adm": "\u003cspan class=\"PubAPIAd\"  id=\"A35
    "adomain": ["vistaprint.com"],
    "iurl": "https://phx.creativecdn.com/images?id=
    "cid": "23041",
    "crid": "BwQltBYc0QvUzWTGRJWq",
    "h": 90,
    "w": 970,
    "mtype": 1,
    "ext": {
        "dspid": 632,
        "wDSPByrId": "10102",
        "advid": 2075,
        "bidtype": 0
    }
}],
"seat": "20092"
}],
"cur": "USD"
```

208.    Given Defendant's Website has "19MM global monthly average unique users" and "312MM annual page views,"[133] it is easy to see how even a purportedly low CPM can add up quickly when multiplied across millions of users and thousands of advertisements.

209.    As another example, Defendant knew Plaintiff was in California when it installed the Bounce Exchange Tracker on her browser based on Plaintiff's IP address, and Wunderkind also collected Plaintiff's IP address through its Tracker, thus revealing Plaintiff's location to Wunderkind. This is visible in the transmission to Wunderkind, which reveals Plaintiff's California-based location:

---

[132] COST PER MILLE (CPM), https://www.appsflyer.com/glossary/cpm/

[133] MASHABLE, https://www.ziffdavis.com/brands/technology/mashable.

**Figure 33:**



```
"vip": "23█████████",
"geo": {
    "country": "US",
    "country_code": "US",
    "country_code3": "USA",
    "country_name": "United States",
    "region": "CA",
    "region_name": "California"
    "city": "Oakland",
    "postal_code": "94605",
    "zip": "94605",
    "area_code": "",
    "dma_code": 807,
    "metro_code": 807,
    "continent_code": "NA",
    "google": {
        "zip": "",
        "country": "US",
        "country_code": "US",
        "region": "CA",
        "city": "San Leandro",
        "continent_code": "NA",
        "country_name": "US",
        "region_name": "California"
```

\*       \*       \*

210.    In sum, Defendant expressly aimed its conduct at California for at least the following reasons: (i) Defendant hosts its Website and domain on California-based serves operated by a California-based company; (ii) Defendant contracts for CDNs located in California that are used to speed up the delivery of Website content to California users of the Website; (iii) Defendant knew where Plaintiff's and other Class Members' browsers were accessing the Website from (California) "when it installed [the Trackers] on [Plaintiff's and Class Members'] device[s]"; and (iv) Defendant knowingly profited from the disclosure and sale of Californians' information through its installation and use of the Trackers.  *See Briskin v. Shopify, Inc.*, --- F.4th. ---, 2025 WL 1154075, at \*3 (9th Cir. Apr. 21, 2025).

## CLASS ALLEGATIONS

211.    Pursuant to Fed. R. Civ. P. Rule 23(a) and 23(b)(3), Plaintiff seeks to represent a class defined as all California residents who accessed the Website in California and had their IP address collected by the Trackers (the "Class").

212.   The following people are excluded from the Class: (i) any Judge presiding over this action and members of her or her family; (ii) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which Defendant or their parents have a controlling interest (including current and former employees, officers, or directors); (iii) persons who properly execute and file a timely request for exclusion from the Class; (iv) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (v) Plaintiff's counsel and Defendant's counsel; and (vi) the legal representatives, successors, and assigns of any such excluded persons.

213.   **Numerosity:** The number of people within the Class is substantial and believed to amount to thousands, if not millions of persons.  It is, therefore, impractical to join each member of the Class as a named plaintiff.  Further, the size and relatively modest value of the claims of the individual members of the Class renders joinder impractical.  Accordingly, utilization of the class action mechanism is the most economically feasible means of determining and adjudicating the merits of this litigation.  Moreover, the Class is ascertainable and identifiable from Defendant's records.

214.   **Commonality and Predominance:** There are well-defined common questions of fact and law that exist as to all members of the Class and that predominate over any questions affecting only individual members of the Class.  These common legal and factual questions, which do not vary between members of the Class, and which may be determined without reference to the individual circumstances of any Class Member, include, but are not limited to, the following:

     (i)     Whether Defendant violated CIPA § 638.51(a);

     (ii)    Whether the Trackers are "pen registers" pursuant to Cal. Penal Code § 638.50(b);

     (iii)   Whether Defendant sought or obtained prior consent— express or otherwise—from Plaintiff and the Class;

     (iv)   Whether Defendant sought or obtained a court order for its use of the Trackers; and

     (v)    Whether Plaintiff and members of the Class are entitled to actual and/or statutory damages for the aforementioned violations.

215.    **Typicality:** The claims of the named Plaintiff are typical of the claims of the Class because the named Plaintiff, like all other members of the Class Members, visited the Website and had her IP address collected by the Trackers, which were installed and used by Defendant.

216.    **Adequate Representation:** Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of the Class Members she seeks to represent, she has retained competent counsel experienced in prosecuting class actions, and she intends to prosecute this action vigorously.  The interests of members of the Class will be fairly and adequately protected by Plaintiff and her counsel.

217.    **Superiority:** The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of members of the Class.  Each individual member of the Class may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability.   Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

## CAUSES OF ACTION

### COUNT I
### Violation Of The California Invasion Of Privacy Act,
### Cal. Penal Code § 638.51(a)

218.    Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

219.    Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

220.    CIPA § 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

221.    A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

222.    The Trackers are "pen registers" because they are "device[s] or process[es]" that "capture[d]" the "routing, addressing, or signaling information"—the IP address and Device Metadata—from the electronic communications transmitted by Plaintiff's and the Class's computers or smartphones. Cal. Penal Code § 638.50(b).

223.    Likewise, the Trackers are "pen registers" because they are "device[s] or process[es]" that "capture[d]" the unique user identifiers associated with each Tracker from the electronic communications transmitted by Plaintiff's and the Class's computers or smartphones. Cal. Penal Code § 638.50(b).

224.    The unique IDs set by the Trackers are "addressing" information because they are used to tie a Website user to the Third Parties' databases and repositories of information about the user and ascertain the user's identity.

225.    At all relevant times, Defendant installed the Trackers—which are pen registers—on Plaintiff's and Class Members' browsers, which allowed the Third Parties to collect Plaintiff's and Class Members' IP addresses and Device Metadata. The Trackers also set a unique user identifier on Plaintiff's and Class Members' browsers so the Third Parties could track Plaintiff and Class Members across multiple Website sessions and multiple websites.

226.    Defendant and the Third Parties used the information collected by the Trackers to:

(i)     identity Plaintiff and Class Members and either create new profiles of them in the Third Parties' databases or match Plaintiff and Class Members to pre-existing profiles (either in the Third Parties' own databases or with another entity's profile);

(ii)    sell Plaintiff's and Class Members' information to advertisers for hyper-targeted advertising based on the

information collected by the Third Parties on the Website—including but not limited to Plaintiff's and Class Members' location information based on their IP addresses—and the information contained on any profiles of Plaintiff and Class Members (which are linked to Plaintiff and Class Members via the information collected by the Third Parties on the Website);

(iii)    actually target Plaintiff and Class Members with advertisements and serve advertisements on Plaintiff and Class Members based on the information collected by the Third Parties on the Website—including but not limited to Plaintiff's and Class Members' location information based on their IP addresses—and the information contained on any profiles of Plaintiff and Class Members (which are linked to Plaintiff and Class Members via the information collected by the Third Parties on the Website); and

(iv)    (iv) de-anonymize Plaintiff and Class Members and generate revenue from the sale of Plaintiff's and Class Members' information—both what is collected on the Website by the Third Parties and the profiles this information is linked to—to advertisers, thus boosting Defendant's, advertisers', and the Third Parties' revenue and the value of the Third Parties' services.

227.    When Defendant installed and used the Trackers on Plaintiff's and Class Members' browsers—and when the Third Parties collected Plaintiff's and Class Members' information—Defendant knew that Plaintiff and Class Members were in California based on their IP addresses. Thus, Defendant harmed Plaintiff and Class Members knowing they were in California and unlawfully profited off Plaintiff's and Class Members' information knowing that information came from Californians.

228.    The Trackers do not collect the content of Plaintiff's and the Class's electronic communications with the Website. *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1108 (9th Cir. 2014) ("IP addresses constitute addressing information and do not necessarily reveal any more about the underlying contents of communication…") (cleaned up).

229.    Plaintiff and Class Members did not provide their prior consent to Defendant's installation or use of the Trackers. Nor did Defendant obtain a court order to install or use the Trackers.

230.   Pursuant to Cal. Penal Code § 637.2(a), Plaintiff and Class Members have been injured by Defendant's violations of CIPA § 638.51(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 638.51(a).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

(a)   For an order certifying the Class, naming Plaintiff as the representative of the Class, and naming Plaintiff's attorneys as Class Counsel to represent the Class;

(b)   For an order declaring that Defendant's conduct violates the CIPA;

(c)   For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

(d)   For statutory damages of $5,000 for each violation of CIPA § 638.51(a);

(e)   For pre- and post-judgment interest on all amounts awarded; and

(f)   For an order awarding and the Class their reasonable attorney's fees, expenses, and costs of suit.

## JURY DEMAND

Pursuant to Fed. R. Civ. 38(b), Plaintiff demands a trial by jury on all causes of action and issues so triable.

Dated: May 5, 2025                Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: */s/ Emily A. Horne*
         Emily A. Horne

L. Timothy Fisher (State Bar No. 191626)
Emily A. Horne (State Bar No. 347723)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ltfisher@bursor.com
         ehorne@bursor.com

**BURSOR & FISHER, P.A.**
Max S. Roberts (*Pro Hac Vice*)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile:  (212) 989-9163
E-mail: mroberts@bursor.com

*Attorneys for Plaintiff*