**BURSOR & FISHER, P.A.**
Kaili C. Lynn (State Bar No. 334933)
Joshua R. Wilner (State Bar No. 353949)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: klynn@bursor.com
jwilner@bursor.com

**BURSOR & FISHER, P.A.**
Philip L. Fraietta (State Bar No. 354768)
50 Main Street, Suite 475
White Plains, NY 10606
Telephone: (914) 874-0710
Facsimile: (914) 206-3656
Email: pfraietta@bursor.com

**BURSOR & FISHER, P.A.**
Max S. Roberts (State Bar No. 363482)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-mail: mroberts@bursor.com

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

DAWN FREGOSA, individually and on behalf of all other persons similarly situated,

Plaintiff,

v.

MASHABLE, INC.,

Defendant.

Case No. 3:25-cv-01094-CRB

**PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF OPPOSITION TO DEFENDANT'S MOTION TO CERTIFY FOR INTERLOCUTORY APPEAL AND TO STAY PROCEEDINGS**

Date: December 19, 2025
Time: 10:00 a.m.
Courtroom: 6, 17th Floor
Judge: Hon. Charles R. Breyer

## REQUEST FOR JUDICIAL NOTICE

Plaintiff Dawn Fregosa ("Plaintiff"), through her attorneys of record, hereby requests the Court take judicial notice pursuant to Federal Rule of Evidence 201(b) of the following documents:

- **Exhibit 1** is a true and correct copy of Ziff Davis's website page titled About Ziff Davis[1], last accessed on November 24, 2025;
- **Exhibit 2** is a true and correct copy of The Atlantic news article *Why Privacy Policies Are So Inscrutable* by Marcus Moretti and Michael Naughton, dated September 5, 2014;
- **Exhibit 3** is a true and correct copy of the Los Angeles Times website[2], last accessed on November 24, 2025;

The Court may take judicial notice of adjudicative facts not subject to reasonable dispute when the facts are: (1) generally known within the trial court's jurisdiction; or (2) "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). "Publicly accessible websites and news articles are among the proper subjects of judicial notice." *Diaz v. Intuit, Inc.*, 2018 WL 2215790, at *3 (N.D. Cal. May 15, 2018); *see also Heliotrope Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971, 981 n.18 (9th Cir. 1999) ("judicial notice that the market was aware of the information contained in news articles").

Exhibits 1, 2, and 3 are publicly accessible websites. This Court may take judicial notice of these websites. *See Kang v. PayPal Holdings, Inc.*, 620 F. Supp. 3d 884, 895 (N.D. Cal. 2022) (granting request for judicial notice of publicly available websites).

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court take judicial notice of Exhibits 1, 2, and 3 filed in support of her Opposition to Defendant's Motion to Certify for Interlocutory Appeal and to Stay Proceedings.

---

[1] ABOUT ZIFF DAVIS, https://investor.ziffdavis.com/overview/default.aspx

[2] LOS ANGELES TIMES, https://www.latimes.com/

Dated: November 24, 2025

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: */s/ Max S. Roberts*
Max S. Roberts

Max S. Roberts (State Bar No. 363482)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-mail: mroberts@bursor.com

**BURSOR & FISHER, P.A.**
Kaili C. Lynn (State Bar No. 334933)
Joshua R. Wilner (State Bar No. 353949)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: klynn@bursor.com
jwilner@bursor.com

**BURSOR & FISHER, P.A.**
Philip L. Fraietta (State Bar No. 354768)
50 Main Street, Suite 475
White Plains, NY 10606
Telephone: (914) 874-0710
Facsimile: (914) 206-3656
Email: pfraietta@bursor.com

*Attorneys for Plaintiff*

**EXHIBIT 1**

NASDAQ: ZD $32.83 +1.02 (3.21%) (Minimum 20 minute delay.)

Ziff Davis reported Q3 2025 unaudited financial results and reaffirmed its 2025 guidan

LEARN MORE

# About Ziff Davis

Ziff Davis (Nasdaq: ZD) is a vertically focused digital media and internet company whose portfolio includes leading brands in technology, shopping, gaming and entertainment, health and wellness, connectivity, cybersecurity, and martech.

| | | |
|---|---|---|
| $1.5B | 8% | 35% |
| In Revenue[1] | Revenue Growth[2,3] | EBITDA Margin[1] |
| 97 | $3.3B | 10% |
| Acquisitions[4] | M&A Spend[4] | EBITDA Growth [2,3] |

1. Based on Q3 2025 TTM results
2. Figures are adjusted and exclude the Consensus business, and any divested assets. The Company has not reconciled the Adjusted EBITDA to the most directly comparable GAAP measure because this cannot be done without unreasonable effort due to the variability with respect to forecasted revenues and costs primarily related to acquisitions and taxation.
3. CAGR period is 2019 through 2024

Skip to main content

NASDAQ: ZD $32.83 +1.02 (3.21%) (Minimum 20 minute delay.)

### Our Brands

Ziff Davis is a multi-billion dollar digital media and internet company that's home to 40+ leading brands serving millions of customers worldwide.

### M&A Program

At Ziff Davis, we employ a systematic and repeatable acquisition program designed for speed, conviction, and consistency in results.

### Corporate Social Responsibility

Ziff Davis embraces the business and societal imperative to have a diverse and inclusive organization, support a sustainable future, and operate using the highest principles of business ethics.

# Presentations & Reports

November 7, 2025

Q3 2025 Ziff Davis Earnings Conference Call

**WEBCAST** **PRESENTATION**

August 7, 2025

Q2 2025 Ziff Davis Earnings Conference Call

**WEBCAST** **PRESENTATION**

May 12, 2025

2024 Environmental, Social & Governance Report

**PRESENTATION**

**VIEW ALL EVENTS →**

Skip to main content

NASDAQ: ZD $32.83 +1.02 (3.21%) (Minimum 20 minute delay.)

Ziff Davis

### Safe Harbor for Forward-looking Statements

Certain statements in this presentation are "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995, particularly those regarding our 2025 financial guidance. These forward-looking statements are based on management's current expectations or beliefs as of November 6, 2025 ("Release Date") and are subject to numerous assumptions, risks, and uncertainties that could cause actual results to differ materially from those described in the forward-looking statements. These factors and uncertainties include, among other items: the Company's ability to grow advertising, licensing, and subscription revenues, profitability, and cash flows, particularly in light of an uncertain U.S. or worldwide economy, including the possibility of economic downturn or recession; the Company's ability to make interest and debt payments; the Company's ability to identify, close, and successfully transition acquisitions; customer growth and retention; the Company's ability to create compelling content; our reliance on third-party platforms; the threat of content piracy and developments related to artificial intelligence; increased competition and rapid technological changes; variability of the Company's revenue based on changing conditions in particular industries and the economy generally; protection of the Company's proprietary technology or infringement by the Company of intellectual property of others; the risk of losing critical third-party vendors or key personnel; the risks associated with fraudulent activity, system failure, or a security breach; risks related to our ability to adhere to our internal controls and procedures; the risk of adverse changes in the U.S. or international regulatory environments, including but not limited to the imposition or increase of taxes or regulatory-related fees; the risks related to supply chain disruptions, increased tariffs and trade protection measures, inflationary conditions, and rising interest rates; the risk of liability for legal and other claims; our ability to consummate a sale of one or more of our business lines pursuant to our announced review of potential value-creating opportunities; and the numerous other factors set forth in the Company's filings with the Securities and Exchange Commission ("SEC"). For a more detailed description of the risk factors and uncertainties affecting the Company, refer to our most recent Annual Report on Form 10-K and the other reports filed by the Company from time-to-time with the SEC, each of which is available at www.sec.gov. The forward-looking statements provided in this presentation, including those regarding

for identification purposes only and shall be considered nominative fair use under trademark law.

**Industry, Market and Other Data**

Certain information that may be contained in this presentation concerning our industry and the markets in which we operate, including our general expectations and market position, market opportunity and market size, is based on reports from various sources. Because this information involves a number of assumptions and limitations, you are cautioned not to give undue weight to such information. We have not independently verified market data and industry forecasts provided by any of these or any other third-party sources referred to in this presentation. In addition, projections, assumptions and estimates of our future performance and the future performance of the industry in which we operate are necessarily subject to a high degree of uncertainty and risk due to a variety of factors. These and other factors could cause results to differ materially from those expressed in the estimates made by third parties and by us.

**Non-GAAP Financial Information**

Included in this presentation are certain financial measures that are not calculated in accordance with U.S. generally accepted accounting principles ("GAAP") and are not intended to be considered in isolation or as a substitute for, or superior to, the financial information prepared and presented in accordance with GAAP. The non-GAAP measures, as defined by Ziff Davis, may not be comparable to similar non-GAAP measures presented by other companies, limiting their usefulness for comparison purposes. The presentation of such measures, which may include adjustments to exclude unusual or non-recurring items, should not be construed as an inference that Ziff Davis' future results or leverage will be unaffected by other unusual or non-recurring items. Please see the "Supplemental Information" to this presentation for details related to how we define these non-GAAP measures and reconciliations thereof to the most directly comparable GAAP measures.

We use these non-GAAP financial measures for financial and operational decision making and as a means to evaluate period-to-period comparisons. We believe that these non-GAAP financial

1 of 23

DOWNLOAD PRESENTATION

# Latest News

November 18, 2025

Ziff Davis to Participate in Two Investor Conferences in December

CONTINUE READING →

November 6, 2025

Ziff Davis Reports Third Quarter 2025 Financial Results and Reaffirms 2025 Guidance

CONTINUE READING →

October 20, 2025

Ziff Davis Appoints J.T. Farley Director of Investor Relations

CONTINUE READING →

VIEW ALL NEWS

## Contact Us

Skip to main content

360 Park Avenue South
17th Floor

NASDAQ: ZD **$32.83** +1.02 (3.21%) (Minimum 20 minute delay.)

800-577-1790
SEND EMAIL

## Quick Links

SEC FILINGS

QUARTERLY RESULTS

FINANCIAL REPORTS

STOCK INFO

## Investor Email Alerts

Enter Your Email Address

SUBMIT

- News
- Quarterly Reports
- Financial Reports
- SEC Filings
- End of Day Stock Quote
- Presentations & Reports

**UNSUBSCRIBE**

Ziff Davis Accessibility Policy | Legal and Patent Notices | Privacy Policy | Privacy Preferences | Contact Us | Site Map

© 2025 Q4 Inc. - All rights reserved
Powered By Q4 Inc. 5.170.0.1

**EXHIBIT 2**

The Atlantic My Account Give a Gift

Give a year of *The Atlantic*, and we'll include our signature tote for free.*

ADVERTISEMENT

TECHNOLOGY

# Why Privacy Policies Are So Inscrutable

The agreements of the 50 most popular websites in America are composed of 145,641 words. This is why.

By Marcus Moretti and Michael Naughton




Josh Hallett/Flickr

SEPTEMBER 5, 2014 SHARE AS GIFT SAVE

Websites didn't used to write privacy policies. As late as 1998 only 14 percent of websites disclosed anything about their data-gathering techniques, even as 92 percent collected "great amounts of personal information" about their customers, according to the Federal Trade Comission. But customers and the government soon caught on, and over the next few years the number of sites that disclosed how they use data caught up to the number that collected it. Today you probably couldn't find a popular site that doesn't have a privacy policy.

We work with data and research digital rights issues, and we were curious whether most popular websites respect your privacy as much as they claim to. So we gathered up and analyzed the 145,641 words that make up the privacy policies of the 50 most popular American websites. (Collectively, they amount to a text that's about as long as *The Grapes of Wrath*.) What we found was that these policies tell you very little about the data these websites have on you. And that's the point.

ADVERTISEMENT

Today's privacy policies don't tell consumers the whole story for two main reasons. First, websites have adopted a kind of precautionary legalese to inoculate themselves against lawsuits and fines. The vaguer and more elastic their language, the more risk reduced. Second, over the past ten years, a new industry of "data brokerage" has arisen to help sites learn more about the people like you and me on the other side of the screen. These firms cross-reference and synthesize data to create richly detailed profiles that can include purchasing habits, political affiliations, sexual orientation, religious beliefs, and medical history. Gathering and analyzing that data is big business, and it creates a strong financial incentive for the firms that collect it to make it as difficult as possible for you to opt out of their net.

* * *

It's easy to get lost in the opaque la y policies. LinkedIn says it will only share your information "as reasonably necessary in order to provide our features

and functionality to you." Facebook pronounces, "We may use any of the non-personally identifiable attributes we have collected (including information you may have decided not to show to other users, such as your birth year or other sensitive personal information or preferences) to select the appropriate audience for those advertisements." Tumblr says, "You may access Third Party Services through the Services, for example by clicking on externally-pointing links." Privacy policies are clearly written for lawyers, not consumers.

> eBay welcomes customers who are concerned about its use of their data to mail a letter to an address in San Jose.

It's not that privacy is so complicated that this is the only way companies can express themselves when it comes to user data. Casey Oppenheim, co-founder of Disconnect, an app that lets you block a website's third-party data gatherers, says there's another reason web companies are so cagey about data: "They know that if they tell people every single way they're collecting information and using it, then most users will share less information, which would mean less money for them."

So what if you wanted to clarify something you read in a privacy policy before clicking "Accept?" Most companies list support channels on privacy policies, but when we tried them out we found that some more hospitable than others. Of the 50 sites we examined, ten provided email addresses for dedicated privacy teams. But the other 40 lumped customer's privacy inquiries in with the rest of their customer feedback. eBay welcomes customers who are concerned about its use of their data to mail a letter to an address in San Jose.

We emailed Paypal about a particular line in their policy: "We do not sell or rent your personal information to third parties for their marketing purposes without your explicit consent."  We had a simple, but important question: "What do you mean by explicit consent?" After five email exchanges, we were no closer to having a specific answer to our question. We did, however, get many helpful tips about how to set up a Paypal account.

Statements about not selling personal information concerned us because their entire meaning is dependent on the definition of "consent." The privacy lawyers and consumer-rights advocates we talked to told us that in America, a consumer can "consent" to a website's data sharin[illegible]g to proactively "opt out" of the default settings. You can "consent" s[illegible]g a website. The term "explicit

consent" requires an affirmative step on the part of the customer, which generally means ticking a box that says you have read and accepted a website's terms and conditions. But as John Oliver said on Last Week Tonight, if Apple put the full text of *Mein Kampf* in its iTunes Terms of Service, we'd all still click "Agree."

This ambiguity surrounding "consent" becomes disconcerting when one considers what one is "consenting" to, namely widespread data collection by third party companies.

* * *

Here's the thing: It's not just Facebook and Twitter that are keeping tabs on your activity. Many of the most popular sites enlist "third parties" to gather your data for them. Privacy policies may lack clear descriptions of data collection practices, but almost all mention third parties. When you visit a website like huffingtonpost.com, not only does The Huffington Post collect your data, but 33 other companies do as well, according to the Disconnect app. By law, websites only need to tell you that they interact with these other companies, not what these companies do with your information. Sites don't even need to tell you which companies they hire. According to their privacy policies, 48 of the top 50 websites in America use third parties. Only nine say which ones.




Marcus Moretti & Michael Naughton

Oppenheim says that the most popular websites partner with ad and analytics companies to grab data and personalize ads so they don't have to themselves. "Those companies are tracking you on their site, and they're tracking you via your IP or your device information, which they log [...]ervers, and make sure they know how you behave on the most popu[...]e web," he said. "And the only

thing ESPN has to say in its privacy statement is that they allow other people to look at their aggregate information."

* * *

A few privacy policies stood out to us for the right reasons. The privacy policy at Xvideos—a porn site—is seven sentences long and, like the videos it hosts, lays it all out there. Wikipedia and StackOverflow—since they're entirely community-supported—don't need to sell your data or serve you personalized ads. These two sites were also the only ones to acknowledge that your IP address can personally identify you—something the E.U. has recognized since 2008. In the U.S., IP addresses are still not legally considered to be personally identifying information—which means companies can record your computer's address without it being considered "personal information."

Taken together, the way America's most popular websites write their privacy policies makes it almost impossible in practice for people to be fully informed about their Internet use and how their data is collected. "The modern privacy policy is a compliance document," says Gautam Hans, a fellow at the Center for Democracy & Technology in Washington, D.C. "They're how companies make sure they comply with the law and don't run afoul of FTC rules. That's mostly it."

It's not just the quality of these documents; it's the quantity as well. A 2008 Carnegie Mellon study found that it would take the average Internet user between 181 and 304 hours to read all the privacy policies for the websites she visits each year. Note that you would have to repeat this exercise every year, because most companies update their policies annually.

This is all strategic: If texts are sufficiently long and boring, then customers won't bother to read or question them. So you might never find out that social widgets—including the ones on the page you're currently reading—let Facebook, Twitter, and the like watch what you do on the sites that use them.

Or you might never know that Internet companies can use the data they have on you as collateral—if that company is unable to repay a debt, your data is transferred to the lender who can then do whatever she wants with it.

And you might never know that ostensibly impersonal data can, collectively, be reconstructed to identify you personally. Many of the 50 websites we looked at assured users that any information shared with third parties is "anonymized." But according to Hans, third parties can decipher anonymized data to figure out who it belongs to. "Because anonymization techniques are computing-based, they can ultimately be reversed through mor computing," said Hans. "Having a 100 percent success rate of anonym ossible."

Personal information like location data can be de-anonymized with as little as two data points: where you work and where you live, each of which is publicly available. Anonymized Netflix user data can be decoded by comparing it with public IMDB.com data. Specific data on your device can be paired with specific data on your browser version to identify you and your entire browsing history, according to Oppenheim.

* * *

There is a camp of people who don't care about data collection. If you are a responsible Internet user, they say, you have nothing to fear.

But that camp is shrinking. According to Pew, half of Americans are "worried about the amount of personal information about them that is online." In 2009, only a third of the population felt that way. As more people learn how much of their personal information is in the hands of strangers with algorithms, they become concerned. "The 'I don't have anything to hide' argument is on its last legs," Oppenheim says.

And it's not just about a stranger knowing intimate details about your life. The prevalence of invisible third parties drastically reduces the speed at which a webpage loads. According to a study by Disconnect, these invisible sites slow down the average page by roughly 27 percent on desktop.

Moreover, that your personal data is held by anyone at all means that your identity is at greater risk of being stolen. 34 million Americans have already experienced identity theft, according to the Bureau of Justice Statistics.

And the future could hold new possibilities of discrimination by data. In the past, banks would "redline" neighborhoods with minority populations and refuse to give loans to these residents. Now some, including the White House, fear that financial institutions or employers might "digitally redline" people based on the profiles they assemble through data collection.

* * *

Moving forward, it's all about transparency. New measures will have to be honest and place the consumer first. Last fall, data broker Acxiom launched a feature that lets you look yourself up on their servers and, after personal verification, adjust the data they have on you (but not remove it). It was a self-serving gesture of openness that in fact gets the company more accurate and more valuable data, for free. But such measures accomplish nothing in the way of genuine respect for user privacy.

Hans thinks that an entirely new doc[...] is needed—one whose audience would be customers, not lawyers. "[...]ld try to create a direct, consumer-friendly, concise document that consu[...] see and get information about

practices that are most relevant to them in the use of their service," he says. "These are the things that consumers are most concerned about, and should be told about in a way that's clearer than the privacy policy currently is."

Progress will come in the form of plain language privacy policies that make consumers want to read. Until then, users can use apps like Disconnect which offer quick ways to inform yourself about websites' data-gathering techniques. Other plugins let you block third party cookies, and you can send a "Do Not Track" signal by adjusting your browser's preferences. The most popular websites field thousands of items of feedback every day, but some of them do listen. Write them asking for simplified privacy information. And, where possible, choose the service that respects your privacy over the one that doesn't.

Writing a respectful, readable privacy policy really shouldn't be that hard, Oppenheim says. "Think about how good Facebook and Google are at presenting complicated things in a simple way. These companies definitely have a way to do this." They just have to want to.

## ABOUT THE AUTHORS



**Marcus Moretti**



**Michael Naughton**

About

Contact

Podcasts

Subscription

Follow

Privacy Policy Your Privacy Choices Advertising Guidelines Terms & Conditions Terms of Sale Responsible Disclosure Site Map

TheAtlantic.com © 2025 The Atlantic Monthly Group. All Rights Reserved.

This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply

**EXHIBIT 3**




LATMG Streaming Now

## LA Times Media Group Streaming

Produced by LA Times Studios, a member of


Los Angeles Times

Behind a son's smile, a silent untreated crisis

new normal
h ocean views

wspaper

# Los Angeles Times

## Legal Terms and Privacy

By continuing, you agree to our Terms of Service, which include arbitration and a class action waiver, and our Privacy Policy. You agree that we and our third-party vendors may collect and use your information, including through cookies, pixels and similar technologies, for the purposes set forth in our Privacy Policy such as personalizing your experience and ads.

CONTINUE

## Top Stories

FOR SUBSCRIBERS

### A scenic L.A. sub with ocean views went off grid. How are residents surviving?

Public utility companies cut service to much of Rancho Palos Verdes' landslide zone more than a year ago, making the Portuguese Bend community one of the state's largest and unlikeliest off-grid communities.



## Missed It




### The L.A. Times 2025 holiday gift guide

The best stocking stuffers, gift shops, gifts under $40, gifts for teens, food gifts, experiences gifts, gifts for gardeners and many more finds are on the L.A. Times Holiday Gift Guide.