**BURSOR & FISHER, P.A.**
Kaili C. Lynn (State Bar No. 334933)
Joshua R. Wilner (State Bar No. 353949)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: klynn@bursor.com
jwilner@bursor.com

**BURSOR & FISHER, P.A.**
Philip L. Fraietta (State Bar No. 354768)
50 Main Street, Suite 475
White Plains, NY 10606
Telephone: (914) 874-0710
Facsimile: (914) 206-3656
E-mail: pfraietta@bursor.com

**BURSOR & FISHER, P.A.**
Max S. Roberts (State Bar No. 363482)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-mail: mroberts@bursor.com

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DAWN FREGOSA, individually and on behalf of all other persons similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>MASHABLE, INC.,<br><br>Defendant. | Case No. 3:25-cv-01094-CRB<br><br>**PLAINTIFF'S OPPOSITION TO MOTIONS FOR LEAVE TO FILE *AMICUS* BRIEFS (ECF NOS. 57, 59)**<br><br>Date: December 19, 2025<br>Time: 10:00 a.m.<br>Courtroom: 6, 17th Floor<br>Judge: Hon. Charles R. Breyer |

## SUMMARY OF THE ARGUMENT

The Motions should be denied in the first instance because *amici* rehash the same arguments made by Defendant in its briefing on the Motion to Dismiss, *amici* are not parties in any other action, and Defendant is already represented by highly-sophisticated counsel. *Angga v. Bumble Bee Foods, LLC*, 2025 WL 2345080, at *1 (S.D. Cal. Aug. 13, 2025) (laying out factors courts consider when deciding whether to accept *amicus* briefs). To the extent the Court provides leave to *amici* to file their briefs, Plaintiff has supplied a response. As laid out in Plaintiff's Opposition Brief (ECF No. 67), the federal judiciary is unanimous in its interpretation of CIPA §§ 638.50-638.51, and state court opinions going the other way "did not engage in the same extended interpretation of the statutory terms." *Shah v. Fandom, Inc.*, 2024 WL 6903081, at *2 (N.D. Cal. Dec. 16, 2024). *Amici*'s argument that the federal judiciary's interpretation implicates basic internet functionality "mischaracterizes the SAC" and has been rejected. *Fregosa v. Mashable, Inc.*, 2025 WL 2886399, at *7 (N.D. Cal. Oct. 9, 2025); *Drummer v. CoStar Grp., Inc.*, 2025 WL 3190656, at *4 (C.D. Cal. Oct. 22, 2025).

COC admits the literal text supports Plaintiff's argument (COC Brf. at 5:20), and its argument that the plain text should be overridden under the absurdity document fails. *Smith v. LoanMe, Inc.*, 11 Cal. 5th 183, 201-02 (2021) (rejecting absurdity argument advocating for a narrow interpretation of CIPA § 632.7). Prior consent has long been the law in California, and the CCPA is perfectly in line with that. *Ribas v. Clark*, 38 Cal. 3d 355, 361 (1985) ("[T]he Privacy Act has been read to require the assent of all parties to a communication *before another may listen*.") (emphasis added); Cal. Civ. Code § 1798.100(a) ("A business that controls the collection of a consumer's personal information shall, *at or before the point of collection*, inform consumers of" the types of information collected) (emphasis added). The CIPA's "language, structure, history, and purpose" support its applicability to Defendant's conduct. *Fregosa v. Mashable, Inc.*, 2025 WL 2886399, at *9. The COC references government websites, but they are not selling user information—and if they are, that is cause for concern as then-Judge Koh previously noted. *See Brown v. Google LLC*, Case No. 4:20-cv-3664, ECF No. 104 (N.D. Cal. Feb. 26, 2021)

Finally, "tester" privacy litigation is a problem with the lawyers bringing such cases, not the law, and not a reason for interlocutory appeal.

# TABLE OF CONTENTS

**PAGE(S)**

SUMMARY OF THE ARGUMENT ..... I

THE MOTIONS SHOULD BE DENIED ..... 1

PLAINTIFF'S RESPONSE TO PROPOSED *AMICUS* BRIEFS ..... 3

I. PROHIBITING THE RECORDING OF IP ADDRESSES BY THIRD PARTIES FOR PROFILING AND ADVERTISING WITHOUT CONSENT DOES NOT IMPLICATE BASIC INTERNET FUNCTIONALITY ..... 5

II. THE CIPA'S PLAIN TEXT IS CLEAR, AND THE FEDERAL JUDICIARY'S INTERPRETATION WILL NOT AND HAS NOT LED TO ABSURD RESULS ..... 7

A. Prior Consent Is Neither Absurd Nor A Dramatic Shift In The Law ..... 9

B. Legislative History Supports The Federal Judiciary's Interpretation Of The CIPA ..... 11

C. Government Websites Are Not Selling Users' Information ..... 12

III. THERE IS NO UNCERTAINTY AS TO THE CIPA ..... 14

IV. "TESTER" PRIVACY LITIGATION IS A PROBLEM, BUT NOT WITH THE CIPA ..... 15

# TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*Am. Fed'n of Gov't Emps., AFL-CIO v. Noem*,
785 F. Supp. 3d 833 (W.D. Wash. 2025) ..... 1, 2, 3

*Angga v. Bumble Bee Foods, LLC*,
2025 WL 2345080 (S.D. Cal. Aug. 13, 2025) ..... i, 1, 2, 3

*Barr v. Am. Assoc. of Political Consultants, Inc.*,
591 U.S. 610 (2020) ..... 14

*BedRoc Ltd. v. United States*,
541 U.S. 176 (2004) ..... 11

*Bradshaw v. Lowe's Cos., Inc.*,
2025 WL 3171740 (S.D. Cal. Nov. 12, 2025) ..... 7

*California River Watch v. City of Vacaville*,
39 F.4th 624 (9th Cir. 2022) ..... 9

*Carmona v. Division of Industrial Safety*,
13 Cal. 3d 303 (1975) ..... 12

CIPA requires. *TBG Ins. Serv. Corp. v. Super. Ct.*,
96 Cal. App. 4th 443 (2002) ..... 3

*Corner Post, Inc. v. Bd. of Governors of Fed. Reserve Sys.*,
603 U.S. 799 (2024) ..... 8, 11

*Doe v. Eating Recovery Ctr. LLC*,
2025 WL 2971090 (N.D. Cal. Oct. 17, 2025) ..... 15

*Drummer v. CoStar Grp., Inc.*,
2025 WL 3190656 (C.D. Cal. Oct. 22, 2025) ..... passim

*Flanagan v. Flanagan*,
27 Cal. 4th 766 (2002) ..... 11

*Fregosa v. Mashable, Inc.*,
2025 WL 2886399 (N.D. Cal. Oct. 9, 2025) ..... passim

*Gabrielli v. Insider, Inc.*,
2025 WL 522515 (S.D.N.Y. Feb. 18, 2025) ..... 14

*Gabrielli v. Motorola Mobility LLC*,
2025 WL 1939957 (N.D. Cal. July 14, 2025) ..... 10

*Garon v. Keleops USA, Inc.*,
2025 WL 2522374 (N.D. Cal. Sept. 2, 2025) .......... 7

*Gutierrez v. Converse Inc.*,
2025 WL 1895315 (9th Cir. July 9, 2025) .......... 14

*Heiting v. Harpercollins Publishers LLC*,
2025 WL 1780936 (Los Angeles Super. Ct. May 15, 2025) .......... 15

*In re Google Inc.*,
2013 WL 5423918 (N.D. Cal. Sept. 26, 2013) .......... 10

*Javier v. Assurance IQ, LLC*,
2022 WL 1744107 (9th Cir. May 31, 2022) .......... 4, 9

*Jones v. Ford Motor Co.*,
85 F.4th 570 (9th Cir. 2023) .......... 14

*Kearney v. Salomon Smith Barney, Inc.*,
39 Cal. 4th 95 (2006) .......... 6, 8, 9

*Lesh v. Cable News Network, Inc.*,
767 F. Supp. 3d 33 (S.D.N.Y. 2025) .......... 9

*Matera v. Google Inc.*,
2016 WL 8200619 (N.D. Cal. Aug. 12, 2016) .......... 11

*Mirmalek v. Los Angeles Times Commc'ns LLC*,
2024 WL 5102709 (N.D. Cal. Dec. 12, 2024) .......... 10, 12

*Motiv Grp., Inc. v. Cont'l Cas. Co.*,
2021 WL 1240779 (C.D. Cal. Apr. 1, 2021) .......... 1, 2

*Popa v. Microsoft Corp.*,
153 F.4th 784 (9th Cir. 2025) .......... 2

*Prang v. Los Angeles Cnty. Assessment Appeals Bd.*,
15 Cal. 5th 1152 (2024) .......... 7, 8, 11

*Ribas v. Clark*,
38 Cal. 3d 355 (1985) .......... 5, 9

*Riganian v. LiveRamp Holdings, Inc.*,
791 F. Supp. 3d 1075 (N.D. Cal. 2025) .......... 7

*Rodriguez v. Autotrader.com, Inc.*,
2025 WL 1122387 (C.D. Cal. Mar. 14, 2025) .......... 15

*Rose v. Variety Media, LLC*,
2025 WL 2794920 (Los Angeles Super. Ct. Sept. 24, 2025) .......... 10

*Ryan v. Commodity Futures Trading Comm'n*,
125 F.3d 1062 (7th Cir. 1997) .......... 2

*Sellers v. JustAnswer LLC*,
73 Cal. App. 5th 444 (4th Dist. 2021) .......... 4

*Sgouros v. TransUnion Corp.*,
817 F.3d 1029 (7th Cir. 2016) .......... 3

*Shah v. Fandom, Inc.*,
754 F. Supp. 3d 924 (N.D. Cal. 2024) .......... 5, 11, 12

*Shah v. Fandom, Inc.*,
2024 WL 6903081 (N.D. Cal. Dec. 16, 2024) .......... i, 7, 14

*Smith v. LoanMe, Inc.*,
11 Cal. 5th 183 (2021) .......... ii, 6, 8, 11

*Spears v. Washington Mut. Bank FA*,
2010 WL 54755 (N.D. Cal. Jan. 8, 2010) .......... 15

*United States v. Forrester*,
512 F.3d 500 (9th Cir. 2008) .......... 7, 10

*United States v. Soybel*,
13 F.4th 584 (7th Cir. 2021) .......... 10

*Walsh v. Dollar Tree Stores, Inc.*,
2025 WL 2939229 (N.D. Cal. Oct. 16, 2025) .......... 6

*Xu v. Reuters News & Media, Inc.*,
2025 WL 3035016 (Santa Clara Super. Ct. Oct. 24, 2025) .......... 10

**STATUTES**

Cal. Civ. Code § 1798.100(a) .......... 10, 12

Cal. Pen. Code § 631(a) .......... 14, 15

**OTHER AUTHORITIES**

A.B. 929 .......... 9, 11, 12

S.B. 690 .......... 15

Plaintiff Dawn Fregosa ("Plaintiff") respectfully submits this opposition to third-parties News/Media Alliance's ("NMA") Motion for Leave to File *Amicus* Brief in Support of Defendant's Motion for Interlocutory Appeal (ECF No. 57) (the "NMA Motion"), and the Alliance for Legal Fairness, California Chamber of Commerce, and California Retailers Association's (collectively, "COC") Motion for Leave to File *Amicus* Brief in Support of Defendant's Motion for Interlocutory Appeal (ECF No. 59) (the "COC Motion") (with the NMA Motion, the "Motions").

**THE MOTIONS SHOULD BE DENIED**

"The district court has broad discretion to appoint *amici curiae. Amicus* participation is generally most appropriate when: (1) proposed *amici* provide unique information or perspective that would assist the Court in determining the matter before it; (2) they have interest in another, similar case that may be affected by the instant outcome; or (3) a party is unrepresented or not competently represented." *Angga v. Bumble Bee Foods, LLC*, 2025 WL 2345080, at *1 (S.D. Cal. Aug. 13, 2025) (cleaned up). The Motions do not meet this standard.

*First*, the proposed *amicus* briefs "do[] not identify any unique information or perspective that will aid the Court in resolving this matter." *Am. Fed'n of Gov't Emps., AFL-CIO v. Noem*, 785 F. Supp. 3d 833, 862 (W.D. Wash. 2025) ("*AFL-CIO v. Noem*"). Indeed, the proposed briefs "set[] forth arguments similar to those in [Defendant's] …opposition. It does not offer a unique perspective or information beyond that provided by the parties." *Motiv Grp., Inc. v. Cont'l Cas. Co.*, 2021 WL 1240779, at *5 (C.D. Cal. Apr. 1, 2021). This is especially the case for COC's *Amicus* Brief, which spends the majority of the proposed brief arguing why a selective reading of legislative history should trump the plain text of the CIPA. *See generally* ECF No. 59-1 at 6-14. This is no different than what Defendant argued in its Motion to Dismiss the SAC. *See generally* ECF No. 34 at 2, 4-8. Similarly, NMA's proposed brief argues "the definitions of 'pen register' and 'track and trace devices' should not be stretched to cover IP address-collecting software used by a website to improve its user functionality and the effectiveness of its marketing." ECF No. 57-1 at 10:20-22. Again, Defendant made the same argument—and mischaracterized the extent of Plaintiff's allegations in the same manner. *See* ECF No. 34 at 13:4-7 ("To hold that the Pen Register Act applies here would have the further effect of criminalizing the use of numerous tools and technologies that permit the modern

Internet to function smoothly, for example, traffic-monitoring software that captures IP addresses to detect malicious traffic and protect websites against cyber-attacks.”).

Thus, the proposed briefs “would merely retread [Defendant’s] arguments and provide no unique assistance in resolving Defendant’s motion.” *Angga*, 2025 WL 2345080, at *3; *see also id.* (denying leave to file an *amicus* brief where the “proposed *amicus* brief contains essentially the same arguments as Plaintiffs’ response in opposition to Defendant’s motion to dismiss, citing to many of the same cases, statutes, and legislative evidence in support,” making “the arguments are nearly identical.”); *Ryan v. Commodity Futures Trading Comm’n*, 125 F.3d 1062, 1063 (7th Cir. 1997) (“The vast majority of amicus curiae briefs are filed by allies of litigants and duplicate the arguments made in the litigants’ briefs, in effect merely extending the length of the litigant’s brief. Such amicus briefs should not be allowed. They are an abuse.”); *AFL-CIO v. Noem*, 785 F. Supp. 3d at 862 (“[T]he proposed amicus brief does not identify any unique information or perspective that will aid the Court in resolving this matter.”); *Motiv Grp., Inc.*, 2021 WL 1240779, at *5 (“[G]ranting UP’s motion would not change the outcome of Continental’s Motion to Dismiss as discussed above. Therefore, although the standards concerning amicus status are liberal, UP’s participation in this case would not serve the purposes of an amicus.”).

*Second*, while *amici* express an interest in Defendant’s victory, they are not parties to any similar actions. *See generally* NMA Motion at 2-3; COC Motion at 1-2. As courts have held:

> a generalized interest in proper administration of law is insufficient to support *amicus* participation … [A]s [*amici* are] not a part[ies] in any case which this decision may implicate, [they do] not fall within the scope of interests district courts generally consider sufficient to support *amicus* participation.

*Angga*, 2025 WL 2345080, at *3. *Finally*, there is nothing indicating that Defendant is not adequately represented. In fact, the opposite is true. Defendant is represented by Perkins Coie, an internationally recognized law firm that is counsel in numerous high-profile privacy cases. *See*, *e.g.*, *Popa v. Microsoft Corp.*, 153 F.4th 784, 785 (9th Cir. 2025) (listening Perkins Coie as counsel for Microsoft, including at least one of the same attorneys, James Snell, here); *In re Google Assistant Privacy Litig.*, Case No. 5:19-cv-04286-BLF (N.D. Cal.). The team working on this matter includes, at least, two California attorneys and another admitted *pro hac vice*. As such, “the parties are well-

represented" and there is no need for additional briefing. *Angga*, 2025 WL 2345080, at *2; *AFL-CIO v. Noem*, 785 F. Supp. 3d at 862 ("The Court here finds that the proposed amicus brief is not necessary or appropriate, given that Defendants are well represented by counsel.").

For the foregoing reasons, the Motions should be denied. To the extent the Court grants the Motions, Plaintiff respectfully requests that the Court account for her response set forth below.

**<u>PLAINTIFF'S RESPONSE TO PROPOSED *AMICUS* BRIEFS</u>**

Sometime after the *Mirmalek* lawsuit was filed, the Los Angeles Times implemented the following disclaimer on its website that users must engage with before accessing the website:




ECF No. 68 at Ex. 3. To be sure, there is a policy debate to be had over whether companies like Defendant should use technology like the Trackers at issue here. *See*, *e.g.*, FED. TRADE COMM'N, ONLINE PROFILING: A REPORT TO CONGRESS 8-17 (2000) (discussing the "benefits of targeted advertising" and the "concern about current profiling practices" that "undermine individuals' expectations of privacy by fundamentally changing the Web experience … to one where an individual's every move is recorded") (cleaned up).[1] But as to whether companies like Defendant can use technologies such as the Trackers, something like the aforementioned disclaimer is all the CIPA requires. *TBG Ins. Serv. Corp. v. Super. Ct.*, 96 Cal. App. 4th 443, 450 n.5 (2002) ("Zieminski's consent [i]s a complete defense to his invasion of privacy claim."). "This is not hard to accomplish, as the enormous volume of commerce on the Internet attests." *Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1036 (7th Cir. 2016). Indeed, it is what Defendant already should have been doing under the CCPA. Cal. Civ. Code § 1798.100(a) ("A business that controls the collection of a

[1] Available at https://tinyurl.com/4r3av7wj.

consumer's personal information shall, *at or before the point of collection*, inform consumers of" the types of information collected) (emphasis added).[2]

As Plaintiff has stated, "[t]his case is not just 'a third party recorded my IP address.'" ECF No. 67 at 1:14. Nor does this case implicate the basic functioning of the Internet. *Drummer v. CoStar Grp., Inc.*, 2025 WL 3190656, at *4 (C.D. Cal. Oct. 22, 2025) ("Defendant has failed to persuade the Court that liability for *further* use of IP addresses would interrupt basic internet function.") (emphasis in original). It implicates a compromise Defendant does not wish to make, and which proposed *amici* go to great lengths not to acknowledge. On the one hand, Defendant could not use the Trackers, and could itself collect less (and anonymous) information from its users. That collection may not require prior consent, but it would mean less revenue for Defendant. *See* SAC ¶ 153 (the use of the Trackers "enriches Defendant, as its users have now become more valuable thanks to the replete information the Third Parties are able to provide about users"). On the other hand, Defendant could procure its users' prior consent before installing and using the Trackers, which would ameliorate the legal issues. But Defendant may fear this will lead to users sharing less information, or not engaging with Defendant's Website to begin with, which may also reduce revenue. *See* ECF No. 68 Ex. 2 at 3 ("They know that if they tell people every single way they're collecting information and using it, then most users will share less information, which would mean less money for them.") (cleaned up).

Defendant chose the worst of both worlds: installing and using the Trackers—which caused users to be de-anonymized, matched up to comprehensive profiles, and sold to an unlimited number of advertisers—without telling its users about that first. *See*, *e.g.*, SAC ¶¶ 2, 5, 125, 161-164 (summarizing allegations). It is that decision that Defendant and *amici* seek to protect. But that is not a decision permitted by California law—not the CIPA, not the CCPA, not even under the common law. *See Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *2 (9th Cir. May 31, 2022) (Bumatay, J., concurring) ("[T]o my knowledge, no case shows that California has adopted retroactive consent as a defense to an invasion of privacy tort."). Nor was Defendant's decision good

[2] The method employed by the Los Angeles Times is not the only way to secure prior consent. But other methods may run "the risk of a court concluding … that the notice [i]s not sufficiently conspicuous." *Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444, 482 (4th Dist. 2021).

policy. Indeed, it defies the policy interests the CIPA was enacted to protect. *See*, *e.g.*, *Ribas v. Clark*, 38 Cal. 3d 355, 360-61 (1985) ("While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and its simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device."); *Shah v. Fandom, Inc.*, 754 F. Supp. 3d 924, 933 (N.D. Cal. 2024) ("That statute reflects the Legislature's judgment that an individual's consent is required before others may track certain addressing information in their electronic communications for non-law enforcement purposes."). But in no case does Defendant's decision implicate the basic functioning of the Internet.

With what is actually at issue in mind, *amici*'s histrionics should fall to the wayside. As should the substance of *amici*'s arguments, as Plaintiff addresses below.

## I. PROHIBITING THE RECORDING OF IP ADDRESSES BY THIRD PARTIES FOR PROFILING AND ADVERTISING WITHOUT CONSENT DOES NOT IMPLICATE BASIC INTERNET FUNCTIONALITY

NMA argues "[t]he overbroad reading of CIPA promoted by Plaintiffs directly implicates innocuous and, in many cases, essential internet functions" because, "for example, Plaintiff['s] claim that recording incoming IP addresses [by website operators] is prohibited by CIPA." NMA Brief at 8:16-18; *see also id.* at 9:5-7 (noting examples of *website operators* that record IP addresses). COC makes a similar argument. COC Brf. at 6:11-13 ("If IP addresses cannot be collected, then the Internet could not function because standard computer operations require recording IP addresses so parties can communicate with one another over the Internet.") (cleaned up). Notwithstanding this is not the extent of Plaintiff's theory of liability, *amici*'s "framing mischaracterizes the SAC." *Fregosa v. Mashable, Inc.*, 2025 WL 2886399, at *7 (N.D. Cal. Oct. 9, 2025). Plaintiff "does not allege that Mashable [or *any* website operator itself] violated CIPA simply by receiving IP addresses as part of an ordinary online exchange." *Id*. Plaintiff alleges that the *Third Parties* recorded her IP address and other information—as caused by Defendant's installation and use of the Trackers—"for profiling and advertising purposes." *Id*. "A user who consents to disclose their IP address to [a website operator] as part of accessing its website does not necessarily consent to disclose their IP address to the third parties operating the Trackers." *Shah*, 754 F. Supp. 3d at 932. And this disclosure to third

parties does not implicate "basic internet function[ality]." *Drummer*, 2025 WL 3190656, at *4.

*Amici* also argue there may be third party services beyond advertising that collect IP addresses. *See*, *e.g.*, NMA Brf. at 10:3-5 ("IP addresses are also used by content management tools, like paywalls, to determine whether a user has already received their free trial sample and to engage in fraud detection."); COC Brf. at 2:14-15 ("[M]any companies use IP addresses as a proxy for residency in order to determine whether the consumer is a California resident and therefore covered by California's privacy regime.") (cleaned up). As Plaintiff noted in her Opposition to the Motion for Interlocutory Appeal, "those technologies are not at issue here," and some of these other services may be exempt from the CIPA. ECF No. 67 at 11:19-12:16; *Walsh v. Dollar Tree Stores, Inc.*, 2025 WL 2939229, at *18 (N.D. Cal. Oct. 16, 2025) ("The Complaint implicates not only Essential Cookies, which may be subject to the carveout similar to the first-party, IP-address-only cookies in *Casillas*, but also Analytics Cookies and Advertising Cookies, which are not used for billing, communication services, or similar purposes.") (cleaned up).

For instance, NMA discusses content delivery networks (NMA Brf. at 9:19-20), which, although mentioned in the SAC for personal jurisdiction, are not alleged to be "pen registers." Moreover, the COC's argument—that websites need to know a user is from California to apply to California law—has been twice rejected by the California Supreme Court. *Smith v. LoanMe*, 11 Cal. 5th 183, 201 (2021) ("A party who wants to record a call that may fall within the strictures of section 632.7 is hardly in an impossible situation."); *id.* (drawing parallels to prior CIPA case where the California Supreme Court addressed and dismissed "the defendant's concern that someone who received a call in Georgia would not necessarily know whether a caller was in California, and hence whether California law applied to the call.") (citing *Kearney v. Salomon Smith Barney, Inc.*, 39 Cal. 4th 95, 127 (2006)). "Recall the technological order of operations … *First*, the user's browser communications with Defendant's Website. Through this transmission, Defendant learns the user's IP address, and therefore, the user's location. *Then*, Defendant's Website—as programmed by Defendant—responds with code or instructions to install the Trackers on the user's browser." SAC ¶ 204. Defendant, as the website operator, can receive a user's IP address as courts have unanimously held. And there is no reason why Defendant, upon learning the user's location, could not then ask

for the user's consent to install and use the Trackers between the first and second steps. In any event, these other technologies are not at issue here, and the Court should not be "persuaded to a different view of the statutory text based on the mere potential for loopholes." *Prang v. Los Angeles Cnty. Assessment Appeals Bd.*, 15 Cal. 5th 1152, 1185 (2024).

## II. THE CIPA'S PLAIN TEXT IS CLEAR, AND THE FEDERAL JUDICIARY'S INTERPRETATION WILL NOT AND HAS NOT LED TO ABSURD RESULS

NMA argues briefly that "[b]oth the legislative history and multiple courts have confirmed that the definitions of 'pen register' and 'tra[p] and trace devices' should not be stretched to cover IP address-collecting software used by a website." NMA Brf. at 10:19-21. This argument has been briefed extensively in this case and others and has been rejected by every federal court to hear it. *Fregosa*, 2025 WL 2886399, at *2 ("[M]ore recent litigation in this district has tested whether software trackers embedded in websites qualify as 'pen registers' when they collect users' IP addresses, device identifiers, and browsing data. Several judges in this District, including Judges Lin, Orrick, Pitts, Ryu, Tigar, and the undersigned, have held that such allegations suffice at the pleading stage."); *Bradshaw v. Lowe's Cos., Inc.*, 2025 WL 3171740, at *7 (S.D. Cal. Nov. 12, 2025) ("[T]he case law is not in Defendants' favor. Indeed, it uniformly supports the opposite outcome."). Indeed, federal courts have long understood that a "device or process" that records IP addresses "are constitutionally indistinguishable from the use of a pen register." *United States v. Forrester*, 512 F.3d 500, 510 (9th Cir. 2008). The state court opinions *amici* cite to, meanwhile, "are not controlling, even in the California state courts," and "did not engage in the same extended interpretation of the statutory terms, but instead drew analogies based on a pen register's traditional functionality and relied on the legislative history." *Shah v. Fandom, Inc.*, 2024 WL 6903081, at *2 (N.D. Cal. Dec. 16, 2024); *see also*, *e.g.*, *Riganian v. LiveRamp Holdings, Inc.*, 791 F. Supp. 3d 1075, 1094 (N.D. Cal. 2025) ("[T]he Court respectfully disagrees with … *Sanchez*, which focused its analysis on the legislative history of the CIPA rather than on the expansive, plain language of Section 638.50."); *Garon v. Keleops USA, Inc.*, 2025 WL 2522374, at *5 (N.D. Cal. Sept. 2, 2025) (declining to follow *Licea* and *Sanchez* because they "reached their conclusions based on an analysis of CIPA's legislative history" rather than "the plain statutory language."); *cf. Drummer*, 2025 WL 3190656, at

*4 n.1 (noting *Casillas* and *Licea* "appear to be based on far less comprehensive complaints than those submitted by Plaintiffs").

COC makes a different argument that Defendant itself never made (*see generally* ECF Nos. 34, 40): that the Court should disregard the CIPA's plain text because "a literal interpretation [of the CIPA] would lead to unintended or absurd consequences." COC at 6:1-2. As COC contends, "the rule is this: [i]ntent prevails over the letter of the law." *Id.* at 5:19 (cleaned up). That is the exact opposite rule of how the U.S. Supreme Court has instructed courts to interpret statutes. *Corner Post, Inc. v. Bd. of Governors of Fed. Reserve Sys.*, 603 U.S. 799, 815 (2024) ("As this Court has repeatedly stated, the text of a law controls over purported legislative intentions unmoored from any statutory text; the Court may not replace the actual text with speculation as to Congress' intent."). The California Supreme Court has said the same thing. *Prang*, 15 Cal. 5th at 1180 ("Where statutory text is unambiguous and provides a clear answer, we need go no further.") (cleaned up). And "[t]he so-called absurdity exception requires much more than showing that troubling consequences may potentially result if the statute's plain meaning were followed or that a different approach would have been wiser or better." *Id.* at 1185 (cleaned up).

Indeed, the California Supreme Court rejected an absurdity argument regarding another provision of the CIPA just a few years ago. In *LoanMe*, 11 Cal. 5th at 199, the California Supreme Court adopted a more privacy-protective interpretation of CIPA § 632.7—that the provision could apply to parties and non-parties alike—over a "narrower interpretation." In doing so, the California Supreme Court rejected an argument that such an interpretation was absurd, holding "any perceived harshness … is lessened by the fact that a party can avoid liability under the statute by taking reasonable precautions, such as obtaining the consent to record the statute requires." *Id.* at 201. Notably, this was the *second time* the California Supreme Court rejected an absurdity-type argument against the CIPA because prior consent was an option. *Kearney*, 39 Cal. 4th at 119 ("A business that adequately advises all parties to a telephone call, at the outset of the conversation, of its intent to record the call would not violate [CIPA § 632].").

This case is no different than *LoanMe* or *Kearney*. As noted above, COC admits the plain text of the statute covers Defendant's conduct. *See* COC Brf. at 5:20 (arguing courts should "not

adopt a literal reading of the statute"). And COC cannot meet the high bar to show the absurdity exception overrides the CIPA's plain meaning. *See California River Watch v. City of Vacaville*, 39 F.4th 624, 634 (9th Cir. 2022) ("[T]his interpretative canon will "override the literal terms of a statute only under rare and exceptional circumstances.") (cleaned up);

**A. Prior Consent Is Neither Absurd Nor A Dramatic Shift In The Law**

COC makes two arguments regarding the "absurd" results of the federal judiciary's interpretation of the CIPA. *First*, COC argues "Plaintiff's interpretation of CIPA's pen register provision would lead to the absurd result that by passing AB 929 in 2015, the Legislature effectively criminalized technologies essential to the functioning of the Internet" because "[i]f IP addresses cannot be collected, then the Internet could not function." COC Brf. at 6:9-12 (cleaned up).[3] As set forth above, this is not Plaintiff's theory, nor are the Trackers "necessary," nor is COC's argument what *any* federal court has held. *See* § I, *supra*; *see also Fregosa*, 2025 WL 2886399, at *7 ("Fregosa does not allege that Mashable violated CIPA simply by receiving IP addresses as part of an ordinary online exchange. Rather, the SAC alleges that Mashable affirmatively embedded third-party trackers that recorded and transmitted users' identifying information to outside entities for profiling and advertising purposes.").

*Second*, COC contends "imposing an opt in regime on the Internet would have been a significant departure from then existing law, of the kind that would not have been adopted silently or obscurely." Mtn. at 7:11-13 (cleaned up). Except it wasn't. California common law has never "adopted retroactive consent as a defense to an invasion of privacy tort." *Javier*, 2022 WL 1744107, at *2 (Bumatay, J., concurring). As to the CIPA specifically, the California Supreme Court made clear forty years ago that prior consent was required for eavesdropping under CIPA § 631(a). *Ribas*, 38 Cal. 3d at 361 ("[T]he Privacy Act has been read to require the assent of all parties to a communication *before another may listen*.") (emphasis added). The California Supreme Court re-emphasized that requirement roughly twenty years ago under CIPA § 632. *Kearney v. Salomon*

[3] Just to be clear (again), the CIPA does not categorically prohibit the use of "pen registers," or any sort of internet tracking technology for that matter. It only requires the prior consent of the website user to do so. *Lesh v. Cable News Network, Inc.*, 767 F. Supp. 3d 33, 42–43 (S.D.N.Y. 2025) (evaluating, although rejecting, consent defense to a CIPA § 638.51 claim).

*Smith Barney, Inc.*, 39 Cal. 4th 95, 119 (2006) (CIPA § 632 "simply prohibits such a party from secretly or surreptitiously recording the conversation … *without first informing all parties* to the conversation that the conversation is being recorded. … A business that adequately advises all parties to a telephone call, *at the outset of the conversation*, of its intent to record the call would not violate the provision.") (emphasis added). It has also been understood for over a decade that CIPA §§ 631-632 apply to Internet technologies. *In re Google Inc.*, 2013 WL 5423918, at *21 (N.D. Cal. Sept. 26, 2013) (Koh, J.) ("[T]he Court finds that section 631 of CIPA applies to emails."); *id.*, at *20 n.12 (citing California Courts of Appeal decisions from 2010 applying CIPA § 632 "to internet communication technologies"). Finally, it has been understood for over a decade that a "pen register" can include a device or process that records IP addresses. *See*, *e.g.*, *Forrester*, 512 F.3d at 510; *United States v. Soybel*, 13 F.4th 584, 586-87 (7th Cir. 2021) (pen register installed under federal statute "to monitor internet traffic in and out of the building").

So, it is not surprising that California law, including the CIPA, requires prior consent. And it is not surprising that CIPA §§ 638.50-638.51—like other broadly worded provisions of the CIPA—applies to the internet technologies that collect IP addresses and other identifiers. *See Gabrielli v. Motorola Mobility LLC*, 2025 WL 1939957, at *11 (N.D. Cal. July 14, 2025) ("If the drafters of Section 638.50 had intended for 'pen register' to be limited to telephone technologies, they knew how to do so—as evidenced by other sections of CIPA where they imposed such limitations.").

This requirement is not contrary to the CCPA. The CCPA states that "[a] business that controls the collection of a consumer's personal information shall, *at or before the point of collection*, inform consumers of" the types of information collected." Cal. Civ. Code § 1798.100(a) (emphasis added). The CCPA specifies the form of that notice and permits consumers to opt-out of further data collection, but it does not permit data to be collected without telling the consumer first. Otherwise, how would a consumer know what data collection they are opting out of? For that reason, as this Court and others have recognized, the "CCPA and CIPA are complementary." *Mirmalek v. Los Angeles Times Commc'ns LLC*, 2024 WL 5102709, at *5 (N.D. Cal. Dec. 12, 2024); *Rose v. Variety Media, LLC*, 2025 WL 2794920, at *4 (Los Angeles Super. Ct. Sept. 24, 2025) ("The Court does not see any problem, at this stage, with the overlap, if any, between CCPA and CIPA."); *Xu v. Reuters*

*News & Media, Inc.*, 2025 WL 3035016, at *3 (Santa Clara Super. Ct. Oct. 24, 2025) ("[I]t does not appear that CCPA and CIPA are in conflict with one another.").

**B. Legislative History Supports The Federal Judiciary's Interpretation Of The CIPA**

COC contends that "nothing in AB 929 … says anything about the regulation of data collection on the Internet or consumer privacy." COC Brf. at 8:6-8. Legislative history cannot trump the plain text of the CIPA. *Corner Post*, 603 U.S. at 815; *Prang*, 15 Cal. 5th at 1180. But COC gives short shrift to the CIPA's legislative history at large. "In enacting the Invasion of Privacy Act, the Legislature declared in broad terms its intent to protect the right of privacy of the people of this state from what it perceived as a serious threat to the free exercise of personal liberties that cannot be tolerated in a free and civilized society." *LoanMe*, 11 Cal. 5th at 199 (cleaned up). "In light of this intent, the California Supreme Court has instructed courts to interpret CIPA in the manner that 'fulfills the legislative purpose of CIPA by giving greater protection to privacy interests.'" *Matera v. Google Inc.*, 2016 WL 8200619, at *19 (N.D. Cal. Aug. 12, 2016) (Koh, J.) (quoting *Flanagan v. Flanagan*, 27 Cal. 4th 766, 775 (2002); otherwise cleaned up).

Thus, the applicability of CIPA here is no accident. Instead, the CIPA's "language, structure, history, and purpose are sufficiently clear, and … [t]he statutory text is *deliberately* expansive, designed to encompass new technologies and apply to conduct like that alleged here." *Fregosa*, 2025 WL 2886399, at *9; *Shah*, 754 F. Supp. 3d at 933 ("The pen register statute is broadly written, and under California law, is to be interpreted broadly to protect privacy and to be applied to new techniques and technologies."). And although COC claims the legislature could have explicitly said it intended the CIPA "to regulate the [data collection] industry" (COC Brf. at 11:7), the legislature did just that through the wording of the statute. *See BedRoc Ltd. v. United States*, 541 U.S. 176, 183 (2004) ("The preeminent canon of statutory interpretation requires us to presume that the legislature says in a statute what it means and means in a statute what it says there.") (cleaned up).

The AB 929 materials COC references "merely describe traditional telephone-based pen registers as being among the "variety of electronic tools used by law enforcement to apprehend criminals in this age of rapidly changing technology. Nowhere in those materials did the Legislature

state an intent to add a statutory requirement limiting pen registers to those traditional forms." *Shah*, 754 F. Supp. 3d at 930 n.2. Further, although COC references comments by AB 929's sponsors (COC Brf. at 8-9), "it is well established that courts will generally not rely even on statements made by individual lawmakers as a reliable expression of the intent of the entire legislative body." *Carmona v. Division of Industrial Safety*, 13 Cal. 3d 303, 311 n.8 (1975). Last, COC states that if the CIPA already regulated internet tracking technology, other legislature does not "make any sense." COC Brf. at 14:10. But again, the "CCPA and CIPA are complementary." *Mirmalek*, 2024 WL 5102709, at *5. The CCPA and other laws gave Californians the right to opt out of *further* data collection, or set forth the form and content that notices of data collection must contain, which the CIPA did not enact. But they did not usurp—and even agreed with—the historical understanding of California law that users must first be told where their private information is going before it is disseminated. Cal. Civ. Code § 1798.100(a).

**C. Government Websites Are Not Selling Users' Information**

Last, COC argues that several government websites "use third party tools to install cookies and collect IP addresses," "[t]he Attorney General's website uses the ADNXS Tracker," and both "the California Privacy Protection Agency's website" and the Court's website "use[] Google Analytics." COC Brf. at 2:18-23. It is unclear what conclusion is authorized by this argument. These websites are not a statute or a decision by a court of law. Regardless, there is a crucial difference between Defendant's Website and those of public agencies: *the government is not selling users' information to advertisers*. For instance, the Assembly and Senate's privacy policies actually state that "we [*i.e.*, the website operator] collect and store … [t]he Internet Protocol Address" and only use cookies "to maintain the functionality of an application."[4] The former is permissible under the CIPA, and the latter might be exempted from the statute as Judge van Keulen noted in *Walsh*. But neither involves the collection of users' identifying information [by] outside entities for profiling and advertising purposes." *Fregosa*, 2025 WL 2886399, at *7.

The Court's website is no different: there are no advertisements on the Court's website, or

[4] Available at https://www.assembly.ca.gov/terms-privacy; https://leginfo.legislature.ca.gov/faces/privacy.xhtml.

facts suggesting consumers are linked to profiles held by data sold. But to the extent that Google is using the information it collects from website visitors in the same way as the Trackers here, that is something that *should* concern the Court as it did for then-Judge Koh when Google made COC's same argument almost five years ago. *See Brown v. Google LLC*, Case No. 4:20-cv-3664, ECF No. 104 at 48:24-49:1 (N.D. Cal. Feb. 26, 2021) ("I have the website up, and I'm deeply disturbed that you would say that the Court's website is selling stuff for third parties."); *id.* at 50:5-11 ("You're not just providing the service that the Court has contracted. You're saying, in addition, give me a copy beyond what you're doing, providing this service to the Court, we want to know and keep track of every user who is accessing the Court's website. I don't see how that is important for Google to provide the service to the Court."); *id.* at 51:19-22 ("I'm disturbed then if you're saying that you're getting that duplicate and collecting that duplicate information of users' browsing history from everyone accessing the Court's website."). The same is true of the CPPA.

Last, there is Attorney General Bonta's campaign website (the actual Attorney General website does not use the ADNXS Tracker). Perhaps General Bonta should be concerned with his campaign website's use of the ADNXS Tracker, as then-Judge Koh was with the Court's use of Google Analytics. But Attorney General Bonta's campaign website, unlike Defendant's, is not selling users' information to advertisers. In fact, based on an investigation of Plaintiff's counsel's own browser traffic, the ADNXS Tracker appears to neither be setting a UUID2 or other cookies (SAC ¶¶ 61, 67-69, 70) nor performing "cookie syncing" to match users to data broker profiles (*id.* ¶¶ 71-77) on General Bonta's campaign website. Indeed, unlike on Defendant's Website, there is no parameter for "cookies" in the ADNXS Tracker on Attorney General Bonta's campaign website:

| | |
|---|---|
| :authority | ib.adnxs.com |
| :method | GET |
| :path | /pixie/up?pi=363d9942-d979-4db5-9a45-fbaa0c89cf02 |
| :scheme | https |
| accept | */* |
| accept-encoding | gzip, deflate, br, zstd |
| accept-language | en-US,en;q=0.9 |
| origin | https://robbonta.com |
| priority | u=1, i |
| referer | https://robbonta.com/ |
| sec-ch-ua | "Chromium";v="142", "Google Chrome";v="142", "Not_A Brand";v="99" |
| sec-ch-ua-mobile | ?0 |
| sec-ch-ua-platform | "Windows" |
| sec-fetch-dest | empty |
| sec-fetch-mode | cors |
| sec-fetch-site | cross-site |
| sec-fetch-storage-access | active |
| user-agent | Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML |

*See also* SAC ¶ 60 (Figure 4, which includes UUID2 parameter). Thus, it does not appear Attorney General Bonta is using the the ADNXS Tracker for remotely the same reason as Defendant here.[5]

**III. THERE IS NO UNCERTAINTY AS TO THE CIPA**

*Amici* claim that interlocutory appeal is warranted to clarify "uncertainty" surrounding the CIPA. NMA Brf. at 7:5-6; COC Brf. at 15:15-17. As Plaintiff explained in her opposition brief, the Court's Order is in harmony with "the entirety of the federal judiciary" (ECF No. 67 at 3:14 (cleaned up)), and state courts are "not controlling" and "did not engage in the same extended interpretation of the statutory terms." *Shah*, 2024 WL 6903081, at *2. Indeed, the state court decisions *amici* cite dealt with whether a "pen register" was solely limited to telephonic technology. NMA Brf. at 11:26-12:1; COC Brf. at 5:3-11. Defendant has already conceded this argument here. ECF No. 34 at 4 n.1 ("Mashable does not maintain that the Act is limited only to telephones.").

To manufacture a conflict, *amici* cite decisions dealing with issues not implicated here or other provisions of the CIPA. For instance, NMA cites *Gabrielli v. Insider, Inc.*, 2025 WL 522515 (S.D.N.Y. Feb. 18, 2025), which dismissed a CIPA § 638.51 claim for lack of standing. But Defendant conceded that issue here by removing this case to federal court. ECF No. 1; *see also Jones v. Ford Motor Co.*, 85 F.4th 570, 573 (9th Cir. 2023) ("Upon removal, the burden to demonstrate Article III jurisdiction shifts to the Defendant as the party invoking federal jurisdiction.") (cleaned up).[6] Judge Bybee's concurring opinion in *Gutierrez v. Converse Inc.*, 2025 WL 1895315 (9th Cir. July 9, 2025), dealt with the first clause of CIPA § 631(a). That clause, unlike the CIPA provision here, is limited to telephonic technology (or, at least, smart phones using their "telephonic capabilities") by its plain language, as district "courts have overwhelmingly agreed." *Id.*, at *3 n.4 (Bybee, J., concurring); Cal. Pen. Code § 631(a) (prohibiting tapping "any telegraph or

[5] Attorney General Bonta's privacy policy does not explicitly mention the ADNXS Tracker. Plaintiff's counsel determined it was presented by examining his browser traffic. Plaintiff's counsel can make the browser traffic available to the Court and others upon request. And of course, political figures are not exempt from statutes. *See*, *e.g.*, *Barr v. Am. Assoc. of Political Consultants, Inc.*, 591 U.S. 610, 621 (2020) (finding "the 2015 government-debt exception created an unconstitutional exception to the" TCPA)

[6] Notably, when a new plaintiff brought allegations against Insider similar to those here, Insider (represented by the same counsel as in *Gabrielli*) removed the action to federal court. *See Pflaumer v. Insider, Inc.*, Case No, 5:25-cv-7481, ECF No. 1 (N.D. Cal. Sept. 4, 2025). Thus, Insider has asserted that allegations like Plaintiff's are sufficient for Article III standing, further disclaiming uncertainty.

telephone wire"). Finally, *Doe v. Eating Recovery Ctr. LLC*, --- F. Supp. 3d ---, 2025 WL 2971090 (N.D. Cal. Oct. 17, 2025), dealt with the second clause of CIPA § 631(a) and is the first decision to Plaintiff's counsel's knowledge to apply the rule of lenity to CIPA. But every federal court has rejected the rule of lenity's application to CIPA § 638.51 (ECF No. 67 at 9:14-18), as did the California Supreme Court to CIPA § 632.7 in *LoanMe*. "[T]hat one district court came to a different conclusion … is insufficient to establish a substantial ground for difference of opinion." *Spears v. Washington Mut. Bank FA*, 2010 WL 54755, at *3 (N.D. Cal. Jan. 8, 2010).

**IV. "TESTER" PRIVACY LITIGATION IS A PROBLEM, BUT NOT WITH THE CIPA**

Finally, *amici* discuss the number of businesses that "have faced CIPA claims related to advertising technology." NMA Brf. at 7:18-19; COC Brf. at 15:2 ("In just the past two weeks, at least twenty-eight new complaints were filed."). This does not accurately describe the issue. A recent report found that 37% of "all web privacy claims" are being filed by two firms: Tauler Smith and Pacific Trial Attorneys. COALITION, INC., THE STATE OF WEB PRIVACY: HOW WRONGFUL COLLECTION IS REDEFINING DIGITAL RISK 9-10 (2025) (RJN Ex. 1). These two firms make use of "tester" plaintiffs who visit websites "fully expecting it to violate [their] privacy so that [they] c[an] file [] action[s]." *Rodriguez v. Autotrader.com, Inc.*, 2025 WL 1122387, at *2 (C.D. Cal. Mar. 14, 2025) (cleaned up) (case involving Pacific Trial Lawyers); *Heiting v. Harpercollins Publishers LLC*, 2025 WL 1780936, at *12 (Los Angeles Super. Ct. May 15, 2025) (in Tauler Smith case, "Plaintiff visited and tested the chat box for CIPA violations of more than 50 different websites"). It is also why many of the state court complaints are "far less comprehensive complaints than those submitted by Plaintiff[]" (*Drummer*, 2025 WL 3190656, at *4 n.1): they are based on copy-paste allegations made by artificial "plaintiffs." This is the problem that the author of SB 690 sought to address. *See* RJN Ex. O at 6 (discussing lawsuits that "use the same 'test plaintiffs' repeatedly – 60, 70, 80, or even 100+ times"). And while tester litigation may have a place in civil rights law, it is particularly unsuited for privacy litigation because tester plaintiffs "seeking to file lawsuits for invasions of [] privacy … ha[ve] no expectation of privacy." *Autotrader.com, Inc.*, 2025 WL 1122387, at *3. Regardless, this is a problem with the lawyers, not the law. And the existence of bad actors is not a reason to interpret the plain text of the CIPA differently, let alone to grant interlocutory review.

Dated: December 1, 2025

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: */s/ Max S. Roberts*
Max S. Roberts

Max S. Roberts (State Bar No. 363482)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-mail: mroberts@bursor.com

**BURSOR & FISHER, P.A.**
Kaili C. Lynn (State Bar No. 334933)
Joshua R. Wilner (State Bar No. 353949)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: klynn@bursor.com
jwilner@bursor.com

**BURSOR & FISHER, P.A.**
Philip L. Fraietta (State Bar No. 354768)
50 Main Street, Suite 475
White Plains, NY 10606
Telephone: (914) 874-0710
Facsimile: (914) 206-3656
E-mail: pfraietta@bursor.com

*Attorneys for Plaintiff*